No. 3646

Second Circuit

PINCHERA v. SHREVEPORT RAILWAYS
COMPANY

(November 18, 1929. Opinion and Decree.)
(December 31, 1929. Rehearing Refused.)

Barksdale, Bullock, Warren, Clark & Van
Hook, of Shreveport, attorneys for plain-
tiff.

Wise, Randolph, Rendall & Freyer, of
Shreveport, attorneys for defendant.

ODOM, J. Plaintiff brought this suit
against the defendant to recover $25,000
damages for personal injuries received
while riding as a passenger for hire on one
of defendant's street cars. He alleges that
on March 23, 1928, just as he entered the
street car and before taking a seat, an ex-
plosion took place in the rear controller
box, causing a flame of electricity and fire
to issue therefrom, completely enveloping
him; and that, as a result, his left hand
and fingers were so severely burned that
the bones were affected; that his hands
and fingers are stiff and that he has lost
use of them; and in addition thereto, his
entire nervous system was so shocked and
injured as to produce a state of chronic
nervousness, insomnia and melancholia;
that his blood vessels were injured and
that his general health is greatly impaired.
He charges gross negligence on the part
of the defendant company.

Defendant, in answer, admitted its ca-
pacity as a common carrier of passengers
for hire, and that plaintiff was a passenger
on one of its cars, but denied generally
all other allegations of plaintiff's petition.
It especially denied that the accident com-
plained of was due to its fault or negli-
gence and averred that it was "due to the
fault of plaintiff himself in unnecessarily
causing the jacket of the controller on the
platform of the car to become loose and
drop out of place by his leaning against
it or misplacing same with his hands or
some part of his body, which permitted or

caused the metal strip at the top of the jacket to come in contact with the controller, causing an electric current to flash and thereby injuring two of the fingers of plaintiff's hand, which negligence bars recovery." In the alternative, it pleads contributory negligence in bar of recovery.

The case was tried before a jury which rendered a verdict awarding plaintiff damages in the sum of $7,500. Defendant appealed from the judgment based thereon; plaintiff appealed also on the ground that the award is inadequate.

## OPINION
## AS TO DEFENDANT'S LIABILITY

Plaintiff was a passenger for hire on one of defendant's electric street cars in the city of Shreveport. It was a two-man car, the motorman occupying the front and the conductor, the rear end of it. Plaintiff entered the car at the rear end, paid the conductor his fare, and, while standing on the platform within eighteen inches or two feet of the controller, there was an explosion, or an electric flash, and a flame of fire from the controller which burned and injured him.

Counsel for defendant concede that, due to the very high degree of care which carriers of passengers for hire are required to exercise for their protection and safety, the plaintiff made out a prima facie case as to liability by establishing the above facts and that, in order to escape liability, the burden was shifted to defendant to show that the accident was due to no fault of its own. This, it attempted to do, but failed.

Defendant established beyond question that its car was equipped with up-to-date, standard appliances, all in good condition at the time of the accident and that the

flash or blaze from the controller was not due to any defect in the wiring or machinery. But the testimony shows that the flash or blaze from the controller was caused by an arc or short circuit which took place when the metal rim around the top of the controller jacket came in contact with the wiring in the controller, and that the jacket came in contact with the wiring because the jacket became loose and fell off, its top end falling or being shoved over against the wiring. The negligence of defendant consists in its failure to have this controller jacket securely fastened on so that it would not fall off. If the jacket had not fallen, there would have been no short circuit, no flash or blaze of fire.

The controller wires are housed in a wooden box, fastened to the end of the car. This box is about 38 inches long, with its lower end three and and one-half inches from the floor. The live wires in the controller box are shielded by a wooden jacket or front which rests on a ledge at the bottom of the box and fits in at the top under another ledge. This jacket or covering is removable and when removed, the wiring is exposed. On either side of this jacket, about half way between the top and the bottom, there are two bolts or knobs, and attached to the immovable portion of the box opposite the knobs, there are hooks or latches which fit down over the knobs. These hold the jacket in place. The hooks or latches are held in place by set screws or taps which screw on to the bolts or knobs, so that when these taps are kept screwed on tight, it is impossible for the latches to be misplaced and impossible for the controller jacket to become loose and fall off. For some reason unexplained, these taps became loose and fell off, the latches got out of place, and the jacket fell off, the lower end striking the

floor and the upper end leaned in and the metal rim around it came in contact with the live wires in the box—hence, the short circuit and the flash of fire which injured plaintiff.

The accident was due to the fact that the controller jacket fell off, and its falling off was due to the fact that the screws and latches were loose. The keeping of the controller jacket securely fastened on was a duty which rested solely upon the defendant. A neglect of that duty, where injury resulted therefrom, most assuredly fastened liability on defendant. Counsel for defendant recognized that and attempted to show that the screws and latches were loose and the jacket fell off through no fault of the defendant's employees.

The testimony shows that the wiring in the controller box is regularly and very often inspected by defendant's employees. To make the inspection, the jacket must be removed. There. is no testimony to show when or by whom this controller box was last inspected and therefore no positive testimony showing that, after the last inspection, the jacket was securely fastened on. Both the motorman and the conductor testified, however, that on the morning of the accident they had not observed anything wrong with the controller box, although they had in operating the car sat or stood very close to it, one of them stating that portions of his body had come in actual contact with it. But this is mere negative testimony and proves nothing, as the fastenings may have been loose without attracting their attention. It is shown that the movements of the car while in operation could have caused the jacket to fall off, if not properly fastened.

In explanation as to how these fastenings may have become loose, the motorman and conductor testified that this was an inbound car coming from the outskirts of the city and that they had brought in eighty to one hundred school children, many of whom had left the car previous to the accident; and that on this occasion, as was their custom, the boys stood up on the platform near the controller box; that boys on previous occasions had meddled with whatever trinket or contrivance they could lay their hands to and that it was probable that they had unscrewed the fastenings and loosened the latches to the controller box on this occasion. However, they said they had never known the boys to meddle with the controller box and that as far as they had ever gone was to blow the whistle and release the sand key, but, upon this particular occasion, they had done neither and, so far as they knew, there was no interference with the controller box.

This controller box was at the rear end of the car where the conductor had his place and where he stood constantly and was in position to see what was going on. He could have seen the boys tampering with the box, if they did so, and if they did so and he failed to see them, that was negligence on his part for it was his duty to look out for all such interferences with the machinery.

Defendant's plea of fault and contributory negligence on the part of plaintiff fails for lack of proof. Plaintiff did not touch the controller box. He and his witnesses so testified, and the conductor himself stated that plaintiff was standing eighteen inches or two feet from the box when the accident occurred. The defendant is clearly liable.

## AS TO THE EXTENT OF INJURY AND QUANTUM OF DAMAGE

The testimony, principally expert, concerning the manner and extent of plaintiff's injury covers probably four-fifths of this voluminous record of 600 pages. There were ten physicians called, each giving his views as to the extent of plaintiff's injuries. Some of them personally attended plaintiff and treated his wounds and stated conditions as they saw them; others gave expert opinions based upon hypothetical questions. Here, as is usual in such cases, they do not agree. Indeed, they are about as wide apart in their views as are the poles. In the course of their examinations, they were led into discussions of highly technical and theoretical questions such as perhaps none but themselves understood. On these questions, they cannot or do not agree, so that if the question hinged upon the highly technical points raised by counsel and discussed by the physicians, the court would be left utterly bewildered— "lost in confusion worse confounded." But fortunately there is some testimony given by lay witnesses, and then there are some physical facts which are not disputed.

Plaintiff's left hand was burned by the flash of fire from the controller box. He received what is termed an "electrical burn." He went to a sanitarium where he was under the care of a special nurse and under treatment of physicians for nine days. One of the physicians testified that the patient was so badly shocked and so excited that it was necessary to administer to him the most powerful sedatives known in order to quiet him; that for some time he suffered the most excruciating pain; that there was an extensive destruction of the soft tissue of the hand, that is, the skin and sub-cutaneous substances, or substances under the skin down to and including the muscular sheet; that the skin and all tissue down to and including the covering of the muscles were destroyed, although neither the tendons nor the periosteum, or bone covering, were destroyed; that he called a surgeon in consultation as it was doubtful whether the hand could be saved; that an x-ray made a month later showed injury to the bones of the hand, brought about by the injury to the blood vessels supplying the nerves. He testified that he treated the patient for seven months, using every known method for the treatment of burns and finally gave up the case, because he was unable to effect a cure. He testified that the patient's hand was disfigured, his fingers left partially stiff and looked like claws; that, during the whole time, the patient suffered intense pain and that he now has in that hand a disease, called "causalgia," which means the constant presence of a burning sensation. He further testified that it was necessary, even up to the time of the trial, to keep the hand covered in order to exclude the air as the air intensified the pain. When the first physician ceased his treatments, the patient went immediately to another one who, while administering no special treatment, had him under observation for a period of six months. That physician found that plaintiff was suffering from "one of these rather peculiar and rare conditions that we sometimes have as a result of nerve injury, when you get a continuous burning pain that lasts for years, slowly subsiding and maybe in the course of time quieting down so that the patient is not troubled with it all the time. That is apt to leave more or less a crippled hand. * * * The character of the pain has been called 'causalgia,' a name given to it by competent neurologists and is a recognized term for that condition."

He stated that when he first saw the patient, he seemed to be well nourished, but very nervous, had his hand covered with cotton and that the hand and arm seemed to be rigid, that he was in pain, that there was impairment of the nerve functions of the hand and that he (the physician) could straighten the fingers, but at the expense of great pain to the patient. He said:

"The wound had already healed, the skin had renewed itself and while the fingers were stiff, they could be moved by me."

Other physicians who examined the patient about the time of the trial, more than a year after the accident, stated that the fingers were highly sensitive, somewhat rigid and distorted, which was due, in their opinion, to the destruction or injury of the nerves and blood vessels. One of them stated that the plaintiff could neither straighten out his fingers to any marked degree nor flex them; that the circulation in the hand had been seriously interfered with.

Two physicians, called by defendant, testified that in their opinion plaintiff did not have the disease known as "causalgia," but their opinion was based upon the assumption that he had received only a first degree, or minor, burn. They stated, however, that what is known as a third or fourth degree burn could cause that disease. There is no doubt that plaintiff did receive a third degree or very severe burn. That is evidenced by the fact that there was sloughing of the tissues and nerve injury.

One of the physicians testified that plaintiff showed signs of traumatic hysteria; that there was a portion of his body on the left side into which he inserted pins, without any indication of pain.

Plaintiff, before the injury, was an expert stenographer and typist, and drew a salary of $150 per month. He was also a pianist of some ability. He cannot use a typewriter or play a piano now. All the lay witnesses say that previous to the accident he was of a cheerful disposition and a good entertainer, but that since then, he is highly nervous, irritable, morose, and altogether a different man. He cannot use his left hand because he says it pains him constantly, and the physicians say that he yet suffers great pain. All the testimony shows that at the time of the trial, the fingers were stiff.

We have read with interest the expert testimony touching the point whether a current of electricity could have or did pass through plaintiff's body, under the circumstances above stated, it being counsel's contention that plaintiff could not have received an electrical shock unless the current actually passed through his body. In view of the testimony of the four electricians called, we conclude that no current passed through his body, and for that reason, it may be true that he received no electrical shock. But the facts are that he received some kind of shock and that he was severely injured.

It is strenuously argued by counsel for plaintiff that the award is wholly inadequate, and by counsel for defendant, on the other hand, that it is grossly excessive. We think the verdict of the jury and the judgment based thereon does substantial justice to both sides.

The judgment is affirmed, with costs in both courts.