No. 867

First Circuit

ANDERSON v. GEORGE A. HORMEL & CO. ET AL.

(October 7, 1931. Opinion and Decree.)
(December 8, 1931. Rehearing Refused.)
(January 4, 1932. Writs of Certiorari and Review Refused by Supreme Court.)

Eraste Vidrine, of New Orleans, attorney for plaintiff, appellee.

Harvey E. Ellis and Frank B. Ellis, of Covington, attorneys for defendants, appellants.

LeBLANC, J. This is a suit for damages for personal injuries arising out of an accident on the north end of the Lake Pontchartrain bridge in the parish of St. Tammany, in which the plaintiff, Henry G. Anderson, was struck by a Ford roadster automobile being driven by one Anthony Plescia, and sustained severe injuries, the most aggravated of which consisted of two fractures of the left arm, one between the shoulder and elbow and the other between the elbow and wrist.

Plaintiff learned that there were two companies bearing the name of George A. Hormel & Company authorized to do business in Louisiana, one George A. Hormel & Company of Austin, Minnesota, and another, George A. Hormel & Company of Texas. The automobile which ran into him bore the trade name, "George A. Hormel & Company," and not being certain as to which the driver worked for, or whether he worked for both, he alleged in paragraph 15 of his petition that the car belonged to both and that Plescia was an employee of both companies. Accordingly, he made them both parties defendant and

obtained a judgment against them, in solido, in the district court, from which this appeal was taken. In this court, their counsel complains of the judgment being in solido against the Texas company, as he contends the evidence shows that at the time of the accident that company had no representative in Louisiana and was not doing business here and there is no evidence that it ever assumed any obligations or tort liabilities of the other company. All of that would be worthy of consideration were it not for the fact that the record contains an admission by counsel, made during the trial of the case, that the allegations of article 15 of the petition were true. Counsel now says that that was not the purport of the admission made and that the record is in error in that particular, but there is nothing beyond the statement in his brief that the admission is erroneously recorded, which is not enough for us to set it aside. Assuming at this time that there was fault and negligence on the part of the driver of the automobile, the judgment was correct in holding both defendants liable in solido.

Plaintiff was in the employ of the receiver of the New Orleans-Pontchartrain Bridge Company which operates a toll bridge across Lake Pontchartrain under a franchise granted by the Louisiana Highway Commission. By the terms of this franchise the company was authorized to charge toll for all traffic going over the bridge, the toll to be regulated according to a tariff which is made part of the contract. The duties of the plaintiff were to collect tolls, answer telephone calls, communicate with the draw-bridge tenders and in general to see that the rules and regulations established by the company were carried out in and around the toll house.

Traffic over the bridge travels north and south and toll is collected only at the north end. The toll house is situated on what is called the approach to the bridge, approximately 95 feet from the end of the bridge proper. It consists of three separate structures, all under a single roof. A room 10 feet 4 inches wide stands on the extreme east and west side of the roadway and there is a span covered by their common roof of approximately 28 feet between them. Almost in the center of this span is the third structure, a small building known as the cashier's house. The room on the eastern boundary is designated as the office, in which the toll collector attends to all other duties save the toll collecting, which is done from the small building in the center known as the cashier's house. On either side of this small house is the traffic lane, one on the east, for the northbound traffic and that on the west -for the southbound. The collector takes toll from traffic going both ways from this station. Both these lanes are narrow, being about 8 feet, 5 inches wide each. The plaintiff testified that his duties required him to cross the lane between the office building and cashier's house at least five times a day and as often as ten times.

In order to regulate traffic in regard to speed and payment of tolls, there were several signs displayed in conspicuous places along the bridge and especially on approaching the toll house. One of the signs at the south end was a warning not to exceed a driving limit of 45 miles per hour. On another large sign in bold· letters were posted the bridge regulations, among which was one to the effect that the driver should approach the draw-bridges and toll house with his car un-

der full control. Four hundred and twenty feet from the toll house, a sign in very large letters read: "Slow—Toll House." A similar sign was posted on the office room of the toll house itself, and on the small cashier's house forming the central unit of the toll house was the sign: "Stop." The two last signs could be read from a distance of 800 feet.

Plaintiff avers and so testifies, that on the morning of March 12, 1930, he came to work at six o'clock and was seated at the desk in the office room, which is the small building on the east side, when at about 6:30, looking through the south window in said building, he saw an automobile approaching from the south, approximately 200 yards away. As was his custom, he, on seeing the automobile, immediately arose from his seat and started to go to the cashier's house to collect the toll. To leave the office building it was necessary for him to pass through it on the west side, on the outside of which was a screen door hinged on the north side and swings from the south to the north on opening. In passing through this door, plaintiff's face is for the moment turned away from the south and the car coming from that direction is for that short instant out of his vision. He had barely left the door and walked down the two steps leading on to the narrow path between the office and the cashier's house when the car he had seen a few seconds before was right on him. It was too late for him to do anything before it ran into him, carried him about 55 feet and continued 75 to 100 feet more beyond the point where he fell off. All the facts would indicate that this car was going very fast as it approached the toll house. Two negroes living in a boat house in a canal near the bridge estimate that it was going anywhere from 45 to 55 miles an hour. As a matter of fact the charge of speeding is not seriously contested, the defense being rather that the driver attempted to bring the car to a stop by applying the brakes, but they did not work. It is argued that the car being a new one, defendants cannot be charged with the defective condition of the brakes. Plescia, the driver attempted to make some explanation about the brakes not working when he was driving over 25 miles an hour, which if such were true, made it all the more necessary for him to travel under that rate of speed so as to have the car under control upon reaching the toll house. But such explanation hardly sounds plausible and, moreover, it is shown that immediately following the accident, Mr. Jacobs, superintendent of the bridge, and Mr. Wahl, another toll collector, after having obtained his permission, drove the car in order to test the brakes and both found them to be working in good order.

We are convinced of the gross negligence of the driver of the defendants' car and now pass to the charge of contributory negligence made against the plaintiff.

The charge is that he started across the narrow lane from the office building to the cashier's house, without stopping to look, and in the face of obvious danger.

Mr. Jacobs testifies that it takes about four or five seconds for a person to walk from the desk where plaintiff was seated when he first saw the car, to the cashier's house where toll is taken. Plaintiff says that it took him about seven or eight seconds to walk the distance, and for the sake of argument, let us take the maximum figure stated by him in considering his action on this occasion. Assuming that he correctly states the distance as being 200

yards that the car was when he first saw it and arose from his seat, if it was going at 45 miles an hour it would have taken eleven seconds to reach the toll house, which would have allowed him three seconds more than required for him to cross over to the cashier's house. We must remember, however, that he had not even reached the center of the pathway before he was struck and had therefore not been gone more than four seconds, which gives a stronger impression and idea of the terrific speed at which the car was coming and of the utter disregard of the driver for the law of the state regulating the driving of automobiles and also of the rules and regulations governing the traffic over the bridge he was crossing, as they appeared posted in the numerous signs and warnings displayed along the route. It was not the first time he had crossed over the bridge and he had always paid toll, coming to a full stop to do so on all other occasions except one, when he slowed down enough to permit him to hand the money to the collector. He was therefore familiar with the conditions around the toll house, knew he had to pay toll and must have known that he could not pay it at the rate of speed he was going. If his brakes were not working properly, as he contends, the situation required him the more to have his car running to a degree of speed where it could be safely controlled. Thousands of automobiles passed over that bridge daily, never failing to stop or slow down to a speed where they could safely pay toll. Plaintiff's action on this morning in starting to walk from the office to the cashier's house when he saw the car coming 200 yards away was no different from what he was accustomed to do at least five and sometimes as often as ten times a day. He was in what might be said to be a zone of safety,

made so by the fact that this was a toll bridge, governed by rules and regulations prominently posted along its course and also by the construction of the toll house itself with its narrow traffic lanes running through. He had the right to assume that the driver of the defendant car would bring it to a stop or at least slow down sufficiently to enable him to pay toll. Had he done so, plaintiff would have had ample time to reach the cashier's house and there would have been no accident. Under the circumstances, we fail to see where he was guilty of contributory negligence, and are bound to hold the defendants liable for the gross negligence of their employee.

We come now to a consideration of the quantum of damages, which is not the least difficult question to determine in the case.

Plaintiff's demand was for the sum of $13,105.67, of which $1,759.85 was for medical and hospital fees and traveling expenses incidental to treatment; $1,345.82 for loss of salary during the ten months and twenty-three days preceding the filing of the suit, and the remaining $10,000 was made up of four items as follows: $3,000 for pain and suffering; $3,000 for breaking of arm in two places, resulting in permanent, partial disability of 50 per cent or more; $1,500 for crushing in of ribs, cut on knee and general contusions over entire body; and $2,500 for general impairment of health. The district judge awarded the sum of $7,759.85, allowing the medical and hospital and traveling expenses in full, $3,000 for pain and suffering for all injuries, and $3,000 for loss of time, disability in arm and general health impairment. Plaintiff has answered the appeal, asking that the judgment be increased to the amount originally prayed for.

There is, and can be no dispute as to the items for doctors, hospital, drug store, traveling expenses and other bills in connection with plaintiff's operations and treatment from the date of his injury to the time he filed suit. They were all fully proven and were correctly allowed by the trial judge. They amount, as already stated, to $1,759.85. The claim for loss of salary during ten months and twenty-three days amounting to $1,345.82 was not specifically referred to by the trial judge in his opinion. He does include loss of time in an item of $3,000, together with disability on account of impairment of arm and general health. We prefer to allow the claim for loss of salary for the period asked, and as proven, as a specific item of damages which we think plaintiff is entitled to recover. In the case of Rogge v. Cafiero, 15 La. App. 565, 131 So. 207, we allowed a young lady stenographer three months' loss of salary at $50 per month because of an arm injury which prevented her from doing her work, and we see no reason why the plaintiff in this case should not be permitted to recover his salary likewise. The demand for $3,000 for pain and suffering is not unreasonable when we consider the seriousness of plaintiff's injuries, the number of operations he had to undergo and the length of time he was under treatment. He had two fractures of the left arm, the one between the shoulder and the elbow being especially severe and painful, according to the testimony of several doctors who testified. He received other injuries about the body, in the face and mouth which also caused much pain and suffering. He was operated on seven different times for the serious arm fracture, six of which operations had to be performed under general anaesthesia. It is generally testified to by the physicians that there is much pain both physical and mental incidental to any operation. Plaintiff himself states that the inserting of a rubber tube through the arm on one occasion caused him the greatest pain, even worse than being struck by the car. The incisions and wound brought on by the numerous operations necessitated a daily dressing which he states was also painful. In the light of all the testimony we have on the question of pain it is hard to conceive of a case in which there could have been more than was endured by this plaintiff and he certainly is entitled to the amount asked for by him and allowed by the district judge.

The next item to be considered is the claim of $3,000 for the disability resulting from the fractured arm. The degree of disability is variously estimated by the doctors who testified as being from 20 to 75 per cent. A careful consideration of the testimony taken as a whole, however, leads us to believe that the disability is about 50 per cent, probably a bit more. In this plaintiff's case the disability is perhaps emphasized due to the fact that a few years prior to this accident he had the misfortune of having had his right arm broken at the wrist and he had not since had its full use and enjoyment. As a matter of fact, whereas before that accident he was right-handed he was forced to train himself to use his left hand for almost every useful purpose and in doing his work as toll collector used it exclusively. In fixing the amount we will allow under this item, we take into consideration the fact that we have already awarded him for ten months' and more loss of salary, and will make this amount $2,000.

For the injury to his ribs, cuts on the knee and general contusions and bruises over the body and face, he had asked for $1,500, but his counsel in brief concedes

that this might be excessive, which we really think it would be. We have decided to allow $350.

The last item to be considered is the claim of $2,500 for general impairment of health. We do not find much testimony with regard to this claim, but at least two of the doctors, Dr. Lacroix and Dr. Heintz, have something to say regarding the effect which a number of operations such as this plaintiff had to undergo may have on the general physical make-up of the individual. "There is always a tendency to greatly reduce the physical endurance," says Dr. Lacroix, and Dr. Heintz considers that "the anticipation of the effect and the ordeal you have to go through" would result in breaking down the general health. Plaintiff testifies that his general health has suffered an impairment by reason of the accident, which, considering the treatment and operations he had to submit to, would seem to be a natural consequence. There is no fixed way by which to determine what this damage amounts to in dollars and cents. The impairment may not be much and on the other hand as plaintiff grows older it may become very much aggravated. We have decided to award him $544.33 on this account, thus making the total amount he is to recover $9,000.

The judgment of the lower court, in our opinion correctly fixed and taxed as costs, the fees of the several experts who testified in the case.

For the reasons herein stated, it is ordered that the judgment appealed from be amended by increasing the amount allowed from the sum of $7,759.85 to the sum of $9,000, and as thus amended, that it be affirmed.