### SIMPSON v. HYDE.
### No. 4374.

Court of Appeal of Louisiana.
Second Circuit.
April 28, 1933.

Hudson, Potts & Bernstein, of Monroe, for appellant.

Geo. W. Lester, of Monroe, for appellee.

MILLS, Judge.

The facts in this case are established with more certainty than is usual in disputes of this character.

At the place where the accident occurred, the Dixie-Overland Highway runs approximately east and west. Plaintiff, walking west along the shoulder on the north side of the highway, reached a point about opposite the Fox driveway. Deciding to cross here, he looked each way and saw the car of defendant about 500 feet away, approaching rapidly from the east. Considering the way clear to cross with safety at least the north half of the paved road allocated to cars running west, he started walking across. He did not look again in the direction of the approaching car until he had reached the black line in the center of the pavement, at which point he heard either the horn or the roar of defendant's motor. Having passed the danger zone of cars coming from the east, plaintiff stopped momentarily, looked west, and saw no cars on the road. He then looked east, and was startled to see defendant's car within 60 or 75 feet bearing down upon him. From the fact that defendant was unable to stop until his car had gone into the ditch to his left, smashed a culvert in the Fox driveway, broken a spring, bent an axle and the frame, and dished the left front wheel, we are satisfied that he was driving considerably faster than his estimate of 15 or 20 miles per hour.

Confronted suddenly with this emergency, plaintiff endeavored to reach a place of safety by running across the road in the direction he was going. Defendant, continuing to bear to the left, ran plaintiff down either just on or just off the south edge of the pavement.

To substantiate the above, we quote briefly from the record. Defendant testifies:

"Q. On what side of the road were you driving when you first saw Mr. Simpson? A. On the right hand side of the road.

"Q. On what side of the road were you driving when you approached Mr. Simpson when he was standing in the road? A. * * * I blew my horn and gradually cutting to the left in order to miss him. Got way over to the left hand side.

"Q. Then you began to cut to the left short-ly after you first observed Mr. Simpson? A. That's right."

There is testimony to the effect that defendant was driving on his left-hand or wrong side of the road when coming around the curve, and continued on that side until he struck Simpson. Accepting his own version of the matter and picturing his car cutting from the right to the left, it would certainly appear to a startled pedestrian in the center of the road to be heading straight for him.

We are satisfied plaintiff had reached the center line when he momentarily stopped. Defendant says that plaintiff stopped, so that he believed he was invited to pass in front of him. The testimony of the disinterested witnesses on this point is:

Miss Haney, defendant's witness, testifies that plaintiff stopped after reaching the center line of the pavement, but adds: "Q. Standing still? A. Kinder stopped."

This does not suggest a full stop.

L. B. Carter, who saw the accident from the filling station some 500 feet to the east, says that he looked down the road ahead of him and saw plaintiff crossing the highway going south.

"Q. Could you tell whether or not he was on the paved part of the highway when you first observed him? A. Well he must have been. I think he was. Looked to me like when I first seen him he was done about half-way or maybe further than that.

"Q. Cross the paved street? A. He seemed like he checked and then he started a little and then the car covered him and I didn't see any more until I went over and he was lying in the ditch."

George Moore, also at the filling station, says: "Q. State whether or not you saw Mr. Simpson on the highway fixing to cross the highway after the car passed your place? A. When the car passed I watched it up the road. I could see Mr. Simpson, looked to me like about three steps on the south of the black line."

Asked if he saw Mr. Simpson stop and stand still, he answered, "No, sir."

Claude Ivey, when asked where plaintiff was when he first saw him, answered, "About middleway the highway."

With no other cars on the highway and nothing to distract his attention, the situation should have been plain to defendant. Seeing plaintiff in the center of the highway manifestly engaged in crossing, defendant was guilty of grave negligence in leaving his right-hand side of the road which was clear for his passage. Had he properly slowed down and permitted plaintiff to continue his way across, there would have been no danger and no emergency. The dangerous situation was created by defendant's neg-

ligence. Suddenly faced with the emergency, plaintiff is not to blame if in his confusion he did not do the particular thing that would have avoided his injury. The natural impulse in such a case is to run in the direction already taken.

■ In rural sections the highway is intended for the use of pedestrians as well as automobiles. Consequently, when a motorist observes pedestrians on the roadway, he must be careful not to injure them. Jacoby v. Gallaher, 10 La. App. 42, 120 So. 888.

As to plaintiff's action in running into the path taken by the car, we find in Baquie v. Meraux, 11 La. App. 368, 123 So. 338, 339: "If she exhibited confusion and darted, first one way, and then the other, her actions in that regard, even though she ran directly across the path of the automobile, cannot be regarded as contributory negligence for the reason that, in the emergency created by the unexpected appearance of the automobile, she could not be expected to exercise the same degree of judgment as one 'not subject to the fear of sudden disaster."

This case is cited approvingly in Cazeaux v. N. O. Public Service, Inc., 14 La. App. 320, 124 So. 685, and Lombardino v. 707 Tire Co., 16 La. App. 460, 133 So. 495.

We feel constrained to disagree with the former opinion of this court that the emergency was created by the plaintiff and that he was contributorily negligent.

■ Finding that plaintiff should recover, it then becomes necessary to discuss the quantum of damages.

Plaintiff is a carpenter, 47 years old, with a wife and child dependent upon him for support.

Considering the force with which the car of defendant shattered the culvert, and considering the distance he was thrown, plaintiff is bound to have suffered a smashing impact. His injuries consisted of a fracture of the left collar-bone, a broken left leg, a sprained ankle, a laceration of the scalp, and severe bruises and contusions over his whole body. He was confined to his bed 6 weeks, obliged to use a rolling chair for 3 more, and then could only move about with the aid of a crutch or stick. All of this was accompanied by great pain and suffering. Though still troubled at the time of the trial with his ankle, his claim to permanent incapacity is based upon the condition of his left arm and shoulder. The break of the collar-bone was a particularly bad one. The fracture was comminuted with a number of slivers of bone broken off. It occurred midway of the bone, directly over the locus of the brachial plexus nerves.

Dr. W. E. Jones, a general practitioner, who treated plaintiff throughout his confinement, Dr. J. E. Walsworth, who practices general surgery, including both orthopedic and neuro, and Dr. C. P. Gray, testify that plaintiff's left arm is useless for carpentry or manual labor, that the collar-bone has good union, the bone slivers have been absorbed, and that, so far as the actual break is concerned, there should be no permanent disability. But they say that from plaintiff's characteristic positions, and from unmistakable symptoms and tests, it is certain that the brachial plexus nerves were damaged by the slivers from the break, and that permanent, incurable partial paralysis of the left arm and shoulder has resulted.

On the other hand, Dr. Guy A. Caldwell, who examined plaintiff during a noon recess at the time of the trial, and Drs. R. W. O'Donnell and George W. Snellings, who observed his examination and tests, say that there is no paralysis or nerve injury; that plaintiff's undoubted disability in the arm and shoulder is due to adhesions and injury to the shoulder joint; that, if the injured man were put under an anesthetic and the adhesions torn loose by forcibly manipulating the arm, he would, with proper co-operation, recover the full use of his arm in 6 months.

Dr. Caldwell admits that he specializes in orthopedic surgery, and that the difference between his specialty and that of a neurologist is as great as that between medicine and surgery.

When the physicians, as is too frequently the case, diametrically disagree, we are compelled to fall back upon lay testimony, the nature of the injury, and the reasonable causal connection between it and the disability claimed. In this case there can be no question about the severity of the injury. The comminuted fracture of the collar-bone with the projecting slivers is plainly shown by the X-ray pictures. No injury is claimed nor shown in the shoulder joint, as indicated in the testimony of defendant's experts. Plaintiff's symptoms and impairments are, we think, consistent with a partial paralysis due to nerve injury. His condition is permanent, and disables him from following his trade as a carpenter or performing manual labor.

In an endeavor to arrive at a proper judgment, we have investigated the amounts allowed in similar cases by this court. We find the following:

$1,500. Negro laborer, earning $4.50 per day, fractured elbow. Some medical testimony that he will not again be able to do laborious work. Southern v. City of New Orleans, 10 La. App. 335, 120 So. 528.

$3,607.50. For injuries to a carpenter, 69 years old, which destroyed his earning capacity, estimated at $1,000 per year. Hodges v. Davis, 7 La. App. 327.

$6,500. Man, 64 years old, crippled for life. Neuman v. Eddy, 15 La. App. 45, 130 So. 247.

$7,500. Where doubtful if plaintiff would ever recover normal use of legs. Flocker v. Kreeger, 10 La. App. 422, 121 So. 360.

$7,500. Carpenter. Fractures of both legs, probably permanently impairing his earning capacity 20 per cent. Landry v. McNeil Hunter Motor Co., Inc., 11 La. App. 380, 122 So. 293.

$7,500. Expert stenographer and pianist, earning $150 per month; hand stiffened so that he could not use typewriter nor play piano. Pinchera v. Shreveport Railways Co., 12 La. App. 91, 124 So. 538.

$10,000. City fireman. Impairment of power to read and speak, probably permanently incapacitating him from returning to work, for which he received $1,500 per year. Webb v. Vicksburg, S. & P. Ry. Co., 9 La. App. 647, 119 So. 720.

$10,000. Injuries to leg permanently preventing osteopath from following her profession. Matsler v. Jones Motor Co., Inc., 14 La. App. 175, 128 So. 721.

The lower court in the present case allowed the sum of $5,213.50. We think the amount should be increased to $7,213.50.

The former judgment of this court is set aside and annulled. The judgment of the lower court is amended by increasing the damages assessed to $7,213.50, and, as amended, is affirmed.