## ELLIS (CENTRAL SURETY & INS. CORPORATION, Intervener) v. WHITMEYER et al.

### No. 5652.

Court of Appeal of Louisiana. Second Circuit.

June 1, 1938.

Rehearing Denied June 30, 1938.

Certiorari Denied Aug. 5, 1938.

Madison, Madison & Fuller, of Bastrop, for appellants.

Bernstein, Clark & Thompson and Theus, Grisham, Davis & Leigh, all of Monroe, for appellees.

DREW, Judge.

In this case the lower court, in a well prepared opinion, has correctly stated the issues and the facts as disclosed by the record. It is as follows:

"Plaintiff, Joe Ellis, brought this suit to recover judgment against defendants, Arkansas-Louisiana Gas Company, Randell Whitmeyer and Fidelity & Casualty Company of New York for damages for personal injuries sustained by him in an accident in which he was struck by an automobile owned by the Arkansas-Louisiana Gas Company, driven by Randell Whitmeyer, an employee of Arkansas-Louisiana Gas Company, and insured by the Fidelity & Casualty Company of New York.

"Central Surety & Insurance Corporation, the compensation insurer of the Louisiana Highway Commission, plaintiff's employer, has intervened in the suit, seeking to recover the compensation and medical expenses which it has paid to plaintiff and for which it has and will become responsible, together with an attorney's fee in the amount of $750.

"Plaintiff's cause of action is founded upon the alleged negligence of Randell Whitmeyer in the operation of the automobile which struck plaintiff.

"The defense is a denial of any negligence on the part of Whitmeyer and defendants plead, in the alternative, that plaintiff himself was guilty of contributory negligence, such as to bar his right of recovery.

"There is little conflict in the testimony of the witnesses and the facts of the case are rather well and clearly established.

"The facts show that on the morning of October 5, 1936, plaintiff, an employee of the Louisiana Highway Commission, in company with six other employees of said Commission, left Monroe and proceeded to a point about a mile and a half west of Choudrant, in Lincoln Parish, where they were engaged in the work of repairing a bridge on U. S. Highway No. 80. In carrying on their work, these workmen operated and used three large motor trucks, one of which is described as a compressor truck. Upon their arrival at the bridge and before beginning their day's work, they placed these trucks at convenient places on the south side of the highway.

"U. S. Highway No. 80 is a paved highway and its general direction is east and west. The pavement is 18 feet wide and there is a black line about six inches wide extending along its center. The shoulders are from five to six feet in width.

"The bridge in question is 28 feet long and 24 feet wide, and was constructed simply by a gradual widening of the pavement from a width of 18 feet to a width of 24 feet. On each side of the bridge, about six inches from the outer edge, is a rail four or five feet high resting on six posts.

"The compressor truck had an over-all measurement of eight feet in width and 21 feet in length. It was headed west, its south side resting against or near the south rail of the bridge. About half of its total length, the rear half, was on the bridge, while the front half extended west of the bridge, and a distance of approximately four feet intervened between the north side of this truck and the black center line on the pavement.

"Having thus located the trucks, the workmen next set out motorists' warning signs both east and west of the bridge. They placed a red flag 220 feet east of the bridge and one 150 feet west of it. They placed what is called a portable 'slow' sign approximately 500 feet east of the bridge and another of similar type approximately 1300 feet west of the bridge. This latter sign was two feet square, with the word 'slow' inscribed on its face in large letters, and stood 18 inches high. A red flag was placed on top of said sign. The signs east of the bridge on the north shoulder of the road and those to the west of the bridge were placed on the south shoulder. They were large enough to be easily seen by a motorist and were located in such position as to be on the right hand side of a motorist traveling toward the bridge and were so placed that the red flag extended over the edge of the concrete slab.

"The highway to the west of the bridge is straight for a distance of 700 feet, at which point a slight curve to the south begins. Looking west the vision point, that is, the point at which a car can be entirely seen, is 1350 feet from the bridge and is on top of a hill. The contour of the surface of the highway is not level all the way between the vision point and the bridge, but a car between these two points can always be seen from the bumper up by a man standing on the bridge. On the other hand, a person traveling toward the bridge from the west, at all times, after reaching the vision point, has a clear view of the bridge and of any persons or cars that may be thereon.

"All preliminary arrangements having been completed and their safety adequately guarded, they thought, these workmen began their labors and continued same, without mishap, until about three o'clock in the afternoon when the accident complained of happened.

"At the time of the accident, four of the workmen, viz; plaintiff, I. S. Rodgers, Willie Jernigan and Blackie Petch, were working on the surface of the highway on or near the bridge, and the other three, including Joe Meeks, the foreman of the crew, were working under the bridge. Plaintiff and Rodgers had just finished sharpening some pilings, on the shoulder of the highway just east of the bridge, and plaintiff had walked to the bridge and had assumed a standing position against the south rail thereof, facing south, at a point on the bridge some four or five feet behind the compressor truck, while Rodgers had stopped at and was leaning against the truck fartherest from the bridge. Jernigan was standing on the top ends of some pilings outside of and next to the south rail and Blackie Petch was standing on the bridge near plaintiff. Reuben Frasier, a visitor on the job, was also standing near plaintiff.

"While all of said parties were occupying the aforementioned positions, Joe Meeks, the foreman, who was then on the south side of and beneath the bridge, called to plaintiff and asked him to meet him on the other side of the bridge. In order to meet Mr. Meeks at the point designated, it was necessary for plaintiff to cross the highway and, on account of some large concrete blocks resting on the shoulder of the road next to the northeast corner of the bridge, to descend the embankment, on the north side, at a point eight or ten feet east of the bridge. Before plaintiff moved from the position he occupied when called by Mr. Meeks he looked toward the west, in which direction he had a clear view of the highway for a distance of 1350 feet, and saw no car in sight. He then turned and started walking at an ordinary gait in a northeasterly direction, toward the point where he intended to descend the embankment and go under the bridge and meet foreman Meeks, and had reached and was in the act of stepping across the black center line when he was struck and knocked down by Whitmeyer's car. According to the most sat-

isfactory calculation I can make, from all of the evidence on the point, plaintiff had walked approximately 30 feet from the place where he stood when Meeks called him to the point where he was struck. During that time, he did not again look toward the west and did not see or hear Whitmeyer's car before it struck him. Not seeing any car approaching from the west, when he looked in that direction, plaintiff thought he had sufficient time to cross to the other side of the highway before a car coming from the west, not yet in sight, could get to the bridge. .

"Randell Whitmeyer was traveling from the west toward the east. There is a conflict in the testimony as to the rate of the speed of his car immediately preceding and at the time of the accident. He was driving a Ford V-8 automobile in first-class mechanical condition.

"Whitmeyer testified that he was driving 50 or 55 miles per hour as he approached the scene of the accident. He did not remember seeing the 'slow' sign west of the bridge, but he did see the red flag floating from the top of that sign. When he saw this red flag, he slowed the speed of his car down to 30 or 35 miles per hour and maintained that speed until the moment he saw plaintiff step from behind the compressor truck, when, in an effort to avoid striking plaintiff, he accelerated the speed of his car. Just before reaching the 'slow' sign, Whitmeyer passed a car owned by J. D. White and occupied by Mr. White and his driver, Vasco Revels. Mr. White and Revels estimated the speed of the White car at a minimum of 55 miles per hour, and Mr. White estimated the the speed of Whitmeyer's car at 65 or 70 miles. This point was a little over a quarter of a mile from the bridge, the scene of the accident, and Mr. White testified that he remarked to Revels that 'the fellow (Whitmeyer) seemed to be in a hurry', and, at that time, observed his own speedometer which was resting on 55.

"Messrs. Rodgers, Jernigan and Petch saw Whitmeyer's car strike plaintiff. Neither one of them saw the car as it approached this point. Rodgers estimated its speed at from 65 to 80 miles per hour; Jernigan from 65 to 70, and Petch at 65 miles per hour.

"A blood spot was left on the pavement at the point where the car struck plaintiff. Whitmeyer stopped his car 162 feet east of this blood spot, the last 43 feet of which distance was marked by skid marks made by the tires of his car.

"Reuben Frasier, a resident of that vicinity, and a mere visitor on the job at the time of the accident, was standing on the bridge near the point where plaintiff was standing just before the accident, and saw the Whitmeyer car coming. Just how far it was when he saw it, he does not say. There is nothing in his testimony to indicate that he had any special reason to observe the speed of the car, but he estimated it at between 35 and 40 miles per hour.

"Whitmeyer's testimony was greatly weakened by his answer to the last question propounded to him on cross-examination. The question was: 'The whole affair is mighty hazy in your mind?' His answer was: 'Frankly speaking, I recall very little except the man stepping from behind the truck and being hit by my car.' In view of this very frank statement, it cannot be said that Whitmeyer had any very definite idea of the rate of speed his car was making just before and at the time of the accident. Reuben Frasier was in no better position, as I see it, to make an accurate estimate of the speed of the car than were Rodgers, Jernigan and Petch. Frasier saw it just before it struck plaintiff and the other three witnesses saw it just as it struck him. Therefore, there is a clear and unmistakable preponderance of the testimony in favor of the finding that Whitmeyer was driving his car at a rate of speed not less than 65 miles per hour at the time he approached and struck plaintiff.

"The first question that presents itself is: was Whitmeyer guilty of negligence in the operation of his automobile? The facts of the case, as I interpret them, answer the question in the affirmative. He was negligent in that he did not keep a proper and cautious lookout. He did not see what he could and should have seen. He should have seen the 'slow' sign 1300 feet west of the bridge. He should have seen the red flag 150 feet west of the bridge. He should have seen one or more of the workmen on or about the bridge. If he had been keeping a careful and cautious lookout, he would have seen all of these. Certainly the sight of the danger signals mentioned and the large truck parked on the bridge on the wrong side of the road should have caused him to slow his car down to a speed at which he could instantly stop it in the event

of an emergency, such as was presented to him when plaintiff walked from behind the compressor truck. Men were at work on the surface of the bridge where they could be seen, and Whitmeyer should have seen them. Vasco Revels and J. D. White, traveling just behind him, saw them as soon as they came in sight of the bridge. Then prudence should have directed him to drive as far to the other side of the road from the compressor truck as he safely could, for there is always danger, in such a situation as this, for someone to walk out from behind something into the pathway of traffic, just as plaintiff did.

"The duty of a motorist, in a situation such as we have here, is clearly defined and set forth by Judge Hamiter's opinion in the case of Daricek v. Forrest, La.App., 173 So. 601, as follows (page 603):

"'After thoroughly considering all of the evidence in the record, we are convinced, as was the trial judge, that plaintiff was negligent in the operation of his car on the occurrence of the collision. Obviously, he was not employing the reasonable and prudent speed and the proper and cautious observance of the road and surrounding conditions which were required of him by the presence of the numerous workmen and trucks, on and near the highway, engaged in the embankment work. No motorist, even though he has the right of way, is absolved from using caution at all times, and the degree of caution to be observed depends upon the conditions and surroundings. Bryan v. Magnolia Gas Company, 13 La. App. 52, 127 So. 124. Under the provisions of section 3, rule 4, subd. (a), of Act No. 21 of 1932, a person operating a motor vehicle on the public highways of this state must proceed at a careful, prudent, reasonable, and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing.'

"The above statement is just as applicable to Whitmeyer and the manner in which he operated his automobile as it was to the plaintiff in the case from which the quotation is taken. But when his conduct is measured by that rule, he is found wanting. If he had maintained a proper lookout and a proper control of his car and had driven it wholly on the north half of the highway as he should have done, he could have easily avoided striking and injuring plaintiff. But, driving at the high rate of speed he was maintaining, he was unable to either stop his car or steer around plaintiff when plaintiff appeared in the pathway.

"In my opinion, he was grossly negligent.

"The next question is: Was plaintiff guilty of contributory negligence?

"Plaintiff was employed by the Louisiana Highway Commission and, at the time of the accident, was engaged in doing the work he was employed to do. His duties under his employment required his presence on the surface of a much-traveled state highway. He undertook to cross the highway just at the time and place he did, first, because his foreman requested him to do so, and, second, because his work necessitated it. Therefore, in crossing the road as he did or as he was in the act of doing, he was just as much at labor as he would have been had he been operating the engine on the compressor truck, or had he been engaged in some form of work under the surface of the bridge. He did not undertake to cross the bridge for pleasure. Neither did he occupy the position of a mere pedestrian on the highway. He was engaged in a work that required him to be where he was and at the time he was when the accident occurred. For that very reason, the law surrounded him with a greater degree of protection, while in the highway, than it would have had he been just a pedestrian moving across the highway at that point.

"It may be well to note, in this connection, that the Louisiana Highway Commission, plaintiff's employer, is charged by law with the responsibility of repairing and maintaining all highways forming a part of the state highway system, and in the performance of that responsibility, it has the undoubted right to temporarily close public highways to traffic or re-route traffic over the highways or to restrict the use of any portion of the highway, while under repair, as appears reasonable and necessary. At the point of the accident, the Louisiana Highway Commission, to all intents and purposes, had closed the south half of the highway to traffic by parking the large compressor truck on that side of the road, and it was then rerouting traffic in both directions over the north side of the road. And it had further restricted traffic at this point by placing danger signals on each side thereof, virtually creating what might be termed a 'safety zone' for several hundred feet on each side of the bridge. At the time he was knocked down by the auto-

mobile, plaintiff had not entered the north half of the highway where Whitmeyer should have operated his car at a cautious rate of speed, but was only in the act of stepping across the black center line when he was struck. If Whitmeyer had confined his car to the open side of the road, while passing over the bridge, he could have avoided striking plaintiff, even at the fast rate of speed he was traveling. He admits, in his testimony, that he was driving astraddle of the black center line when he first observed plaintiff, just a few feet ahead of his car. So it seems clear to me that Whitmeyer, in the negligent operation of his automobile, invaded a portion of the highway that was specially and legally set aside by the Louisiana Highway Commission, acting through its agents and employees, as a safety zone for the use of its employees while repairing and making safe for travel the bridge in question.

"Our laws surround a workman with a greater degree of protection than they do an ordinary pedestrian, that is, while he is working on the highway, and that is as it should be. If a workman in the highway, while at work, was under obligation to be on the lookout constantly for the approach of automobiles, as it is the obligation of the pedestrian, the highways, in many instances, would, or at least they might, become impassable, because workmen engaged in repairing them would not be able to work due to the fact that they would have to spend all of their time watching traffic. Hence, the reason for the law that the laborer in the highway has the right to assume that the driver of an automobile approaching him will approach him with his car under such control as to be able to avoid injuring him.

"It is suggested that plaintiff should have stopped and looked to the west upon his reaching the north side of the compressor truck and before attempting to cross the open portion of the street beyond it, and that if he had done so he would have seen Whitmeyer's car coming and could have dodged it. If he had stopped and looked at that point, no doubt he would have seen the car coming and would have avoided the collision. But was it his duty, under the law, to do that? If so, then perhaps it would also have been his duty to jump off the south side of the bridge and walk under it in order to meet his foreman on the north side of the bridge.

To require of him that he follow either of these courses is to deprive him of the legal protection that the law gives to a workman in the highway, that is, that the driver of an automobile will operate his car with due caution and with it under proper control.

"Blashfield and Huddy, two well known and accepted authorities on automobile law, treat in detail and at length the relative relationships between motorists and workmen in the highway. It would serve no useful purpose to copy these treatises here. Sufficient in that respect is the following quotation from Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Volume 2, page 605, § 1577, to-wit:

" 'The general rule in respect to vehicles applicable to pedestrians in the street does not apply to a workman or other person, whose duties require him to be in that part of the street devoted to the use of vehicles; as ordinarily a pedestrian has no occupation requiring his presence in that part of the street. For this reason, a workman in the street is not required to exercise the same diligence in watching for danger as pedestrians using the streets merely for travel; the care required from him being ordinarily a question of fact, to be determined from all the surrounding circumstances.

" 'The laborer is entitled to keep his mind on his work, and it is not negligence as a matter of law for him to fail to continuously look and listen for approaching vehicles. Such a workman can rely, to some extent, on the assumption that the driver of a motor vehicle will exercise some care to avoid hitting him. Under this rule, a workman in the street may assume that motorists will keep a proper lookout.'

"Section 1571 of Blashfield's work, same volume, contains an illuminating discussion of the same relationship.

"A leading case on the question is that of Chaney v. Moore, 101 W.Va. 621, 134 S.E. 204, 47 A.L.R., page 800. In many respects that case is on all-fours with the one at bar.

"See the following Louisiana cases: Anderson v. Hormel & Company, 18 La. App., 398, 136 So. 906; Latham v. Umbach, 3 La.App. 301.

"Able counsel for defendants contend, with great seriousness and in a very per-

suasive manner, that plaintiff was guilty of contributory negligence. In support of this contention, they cite the following cases: Roder v. Legendre et al., 147 La. 295, 84 So. 787; Andrus v. Boudreaux et al., La.App., 158 So. 679; Terrebonne v. Huger, 14 La.App. 679, 130 So. 835; and Anderson v. Clesi, 143 La. 570, 78 So. 943.

"The facts of all of these cases are clearly distinguishable from the one at bar.

"In the Roder Case, the plaintiff, before attempting to cross Canal street, in New Orleans, saw automobiles approaching as close as a block and a half or two blocks away. The court held that she was negligent for not looking again in the direction of these cars when she was ready to cross the street. In the cited case, the plaintiff was not a workman in the street, but a pedestrian, and she saw the automobile which struck her coming toward her only a short distance away.

"In the Andrus Case, the facts disclose that he was foreman of a crew of men doing road work. He undertook to cross the road ahead of a fast-moving truck which was then only 15 or 20 feet away from him. Of course, he was grossly negligent. And it may be further noted that he was not at work at the time of the accident.

"In the Terrebonne Case, the plaintiff was a traffic policeman. In the discharge of his duties as such, he required the defendant to move her parked automobile to another place. As she did so, he stepped behind it and was jammed between it and another car. The facts of that case are not comparable with those of the one at bar in any respect.

"In the Anderson Case, the court found that the plaintiff *ran against* defendant's automobile, and not that the automobile ran against him. So that case is not in point in any respect.

"Before plaintiff undertook to cross the highway, he looked to the west for approaching traffic and Whitmeyer's car was not in sight. He estimated, according to his testimony, that he had a clear view for a distance of 700 feet, but, in fact, he could see in that direction a distance of 1350 feet. He believed, and he had just reason to believe, that he could safely cross the highway before any car, traveling at a reasonable speed, could travel that distance. He knew there was a 'slow' sign and two red flags within that distance

placed on the edge of the pavement in full view of any motorist. He had the right to assume that motorists would see those danger signals and would heed their warning. As I view the matter, he was not negligent, and therefore was not guilty of contributory negligence.

"Whitmeyer's negligence was the sole and proximate cause of the accident and the resulting injury to plaintiff.

"Plaintiff was seriously and painfully injured. He was knocked to the pavement and rendered unconscious. He was picked up by Mr. Whitmeyer and his fellow-workmen and carried to Dr. Mosely's clinic, in Monroe. Both bones of his left lower arm were broken and the ends of the bones protruded through the skin. His left leg was broken. One rib was broken and a hole thereabout punctured in his side by the broken rib. His head, body and limbs were bruised and lacerated. He remained in the clinic for 74 days, 68 of which were spent in bed. His arm was extended for 32 or 33 days, with a weight attached, during which time he was required to lie on his back, practically motionless. During this period he developed traumatic arthritis and his pain was intense. Dr. Mosely operated on his arm and tried to tie the ends of the broken bones together, but the operation was not a success.

"After being at home about two weeks, he went to the Charity Hospital, in New Orleans, where he remained about 35 days. There, the doctors operated on his arm again. They took out the plate which Dr. Mosely had used in an effort to tie the bones together. They took a piece of bone out of his left tibia and used same to make two grafts, one on each of the broken bones in the forearm. This was a major operation and was, of course, very painful. He returned home and stayed about three weeks, went back to the Charity Hospital in connection with said operation and again remained 44 days. He had been at home about three weeks when this case was tried. In all, he has spent 173 days in the two hospitals. The second and last operation was a failure as was the first. Before the injury he weighed 185 pounds. On the day of the trial he weighed 154 pounds, but had weighed as low as 144 pounds. His injury and the operations to which he has been subjected have greatly shocked him, both mentally and physically. He has the appearance of both a mental and physical wreck.

"Four distinguished surgeons testified in the case, viz., Dr. J. M. Mosely, Dr. Howard R. Mahorner, Dr. Guy A. Caldwell and Dr. A. Scott Hamilton. They all agree in the opinion that plaintiff is totally disabled to do manual labor, and it is their unanimous opinion also that he will be permanently disabled, unless a successful graft operation can be performed on his arm whereby proper union of the broken bones can be effected. They say that such an operation is possible, but that it would have only a fifty-fifty chance of being a success and, should such operation be performed and be a success, he could not hope to regain more than 75% of the original strength and usefulness of his arm. They estimate that it would require from 18 months to two years for him to regain that percentage of strength in his arm through said operative procedure. It would not require one operation only, but a series of operations, all of which would be very painful and would be a great strain upon his mental and physical resources.

"It seems to me that this is a case in which justice to the plaintiff demands that he be held to be permanently disabled. All doubts should be resolved in his favor. He may regain his strength to go through another operation and the months of pain and suffering that would accompany it, and then the operation may be unsuccessful. In that event, there could be no question as to his being permanently disabled, but if he is now held to be only partially, permanently disabled, he could not then, of course, recover damages for permanent total disability. The defendants caused his injury without legal justification or excuse and if there is any risk to run in the matter, they should be the ones to bear it. Plaintiff is the innocent party and is entitled to the benefit of all doubts in the premises.

"Plaintiff is 50 years of age and has a life expectancy of 20.91 years. He is an uneducated man and has to depend upon manual labor for his livelihood. He has a wife and an eleven-year-old son who are dependent upon him for support, and the son is dependent upon him for his education. At the time of the accident, he was earning $15 per week. He had earned considerably more and had hopes of a more lucrative employment.

"On the question of the amount of damages counsel for both plaintiff and defendants have submitted numerous cases for the guidance of the court in fixing the proper amount. I have examined all of them and they have been very helpful.

"This is a case in which I think a maximum amount of damages should be allowed. It should be considered that plaintiff's injury has brought him to a state of financial poverty. He can never perform manual labor again and that is the only type he is qualified to perform. He has suffered an indescribable amount of mental and physical pain and the end of that suffering is not near in sight. If he should recover, at least two years of his life must be given to the doctors, to hospitals, to pain and suffering and to mental anguish. I think the present value of money should be taken into consideration. As everyone knows, the value of money has greatly depreciated within the last year or two and the prospect is that said depreciated value will continue for some time to come. Then the ability of the defendants to pay should be considered. They are well able to pay a large judgment.

"I think an award of $15,000, as compensation for all losses sustained on account of total and permanent disability, pain and suffering, etc., will be just and equitable.

"In his petition, plaintiff claims a total sum of $1520 for doctors', nurses' and hospital bills, together with medicines and expenses incurred in going to and from different hospitals. More than that amount of such expenses has been proven, but he cannot recover more than he sues for. So, under the head of expenses incurred and to be incurred for doctors' bills, hospitalization, etc., he should have judgment for $1520.

"It was stipulated by counsel in the trial of the case that the experts who testified in the case should be allowed $25 each; that the engineers should be allowed $35 each; and the stenographers writing the depositions certain fixed amounts for their services, all to be taxed as costs. All of the items mentioned are recognized and should be taxed and paid as costs of the case.

"Considering the petition of intervention herein filed by the Central Surety & Insurance Corporation, compensation insurer of the Louisiana Highway Commission, seeking recovery of compensation and medical expenses paid by it and for which it has and will become responsible, and of a fee for its attorney, it follows that said cor-

poration should have judgment in its favor and against the defendants for the items mentioned, and for an attorney's fee, which is fixed at the sum of $750.

"Summing the matter up, there should be judgment herein in favor of plaintiff, Joe Ellis, and against the defendants, Arkansas-Louisiana Gas Company, Randell Whitmeyer, and the Fidelity & Casualty Company of New York, in solido, for the sum of $16,250, with five per cent per annum interest from date of judicial demand, until paid, with all costs of this suit.

"And there should be further judgment in favor of the Central Surety & Insurance Corporation, Intervenor, subrogating it to the rights of plaintiff, Joe Ellis, in and to the judgment in his favor against the above named defendants, for the full amount of compensation it has paid plaintiff and for which it has become responsible to him, for the amount of medical expenses it has paid, the sum of $250, and an attorney's fee in the sum of $750.

"E. L. Walker, Judge."

To its opinion, the lower court added the following per curiam:

"In the written opinion heretofore filed in this case, the amount of $1520 was allowed for expenses incurred by plaintiff for doctors' bills, hospitalization, etc., and it was stated that more than that amount of such expenses had been proven, but that plaintiff cannot recover more then he sues for, the total amount of these expenses claimed in the original petition being $1520. Plaintiff's counsel has since called the court's attention to the fact that he filed an amended and supplemental petition in which it is alleged that plaintiff will be required to expend the additional sum of approximately $2000 for hospitalization and doctors' bills in an effort to recover his health. This amended petition was overlooked by the court.

"The items of expense proven and for which plaintiff is entitled to judgment are as follows:

Dr. C. H. Mosely............... $1280.00
Expenses incurred in going to and
   returning from New Orleans..   200.00
Future doctors' bills and hospitalization, in connection with another operation or operations..   1000.00
                       .$2480.00

"Therefore, plaintiff should have judgment for doctors', nurses' and hospital bills, and other expenses incurred for the sum of $2480, instead of the sum of $1520, and the total amount of the judgment should be $17,480."

And it awarded judgment in accordance therewith.

Defendants prosecute this appeal and plaintiff has answered the appeal praying that the amount of the award be increased to the sum of at least $40,000.

A careful study of the voluminous record has convinced us that the ultimate conclusion reached by the lower court is correct. The gross negligence of defendant Whitmeyer positively glares at one from the record. It would be difficult to imagine a case where greater negligence could have been committed than the record shows Whitmeyer to have been guilty of.

The only defense urged which is anyways serious is that of contributory negligence. The lower court disposed of that defense on the theory that extraordinary precaution was due a workman whose duties required him to be on the highway, and that such a workman was not held to the same degree of care and caution in crossing the highway as an ordinary pedestrian would be. We fully agree with the conclusions of the lower court in this respect, but in this case we think it unnecessary to resort to the rule applicable to workmen; and under the doctrine laid down in the cases of Hamilton v. Lee, La.App., 144 So. 249, and McDonald v. Stellwagon, La.App., 140 So. 133, the plaintiff was not guilty of any negligence in attempting to cross the highway at the time he did. While it is true these two cases involved two motor vehicles and not a pedestrian, there is no good reason why the rule laid down therein should not be applied to a pedestrian.

Plaintiff, before starting to cross the highway, looked to the west, and at that time there was no car in sight. He knew the "slow" sign and red flag were properly placed; that the south side of the road was blocked by the big compressor truck, which also carried a red flag, and he had the right to assume that anyone in an automobile coming from that direction would observe the warnings and bring his car under control. If this were done, he would be in no danger in crossing the highway. He had the right to assume that anyone seeing a set-up such as existed at this bridge, would be cautious and would not be held to be on the lookout for a motorist who would at-

tempt to pass at a speed of at least 65 miles per hour, without sounding the horn and in utter disregard of the rights of all others. We are of the opinion that had plaintiff been merely an on-looker and not a workman, under the circumstances and conditions, he would not have been guilty of contributory negligence.

A pedestrian case somewhat in point, and holding to the same rule laid down in the two above cited cases, is Simpson v. Hyde, La.App., 147 So. 759, where we held it was not negligence for plaintiff to attempt to cross a highway when he saw a car coming at a fast rate of speed 500 feet away, and that after he had passed the black center line and was out of the proper path of the on-coming car, if struck, the car driver was liable.

In the case at bar, plaintiff was justified in assuming that Whitmeyer would observe the warning signals and was not held to assume that he would ignore them.

■ We find no good reason for disturbing the amount of the award. We are of the opinion it does justice between all parties.

The judgment of the lower court is therefore affirmed, with costs.