## MILLER v. CITY OF NEW ORLEANS.*
### No. 14570.

Court of Appeal of Louisiana. Orleans.
Jan. 29, 1934.

*Rehearing denied February 12, 1934.

Nat .W. Bond, Henry B. Curtis, and Charles A. O'Niell, Jr., all of New Orleans, for appellant.

Jos. A. Casse, of New Orleans, for appellee.

JANVIER, Judge.

·At about 7:30 o'clock on the night of October 12, 1931, plaintiff, Natalius Charles Miller, while stepping from the sidewalk to the street at the corner of Howard avenue and Dryades street, caught his foot in the displaced metal edging of the sidewalk curbing and fell, striking his back upon the concrete curbing, the metal edge thereof, or the paving of the street. He sustained most severe injuries.

Charging the city of New Orleans with negligence in failing to maintain the said sidewalk and curbing in good condition, and alleging that such negligence was the proximate cause of his injuries and, asserting his own freedom from fault, Miller seeks from the city recovery in a very large sum.

Defendant municipality, for want of information, denies all the allegations made in regard· to the actual occurrence of the accident and specially avers that, if there was, at the time of the accident, any defect, as alleged, plaintiff should have noticed it, and that his failure to do so and his negligence in stumbling, or tripping over an apparent obstruction, constituted contributory negligence on his part.

The matter was tried by jury, which rendered a verdict for plaintiff in the sum of $19,000. From a judgment based thereon, defendant has appealed.

Plaintiff, having answered the appeal, asks that we increase the award.

A municipality is, of course, not liable for the results of all defects in sidewalks, streets, or highways.

■ In the first place, in order that there be liability, there must exist a condition which is patently dangerous even to reasonably care- ·ful and ordinarily prudent persons.

■ In the second place, even if the defect be one which is obviously dangerous, the municipality, in the absence of statute specifically fixing liability, cannot be held unless it has had actual notice of the existence of the defect sufficiently in advance of the accident to have had opportunity to make the necessary repair, or unless the defect has existed for a sufficient time to render it proper to say that the municipality should be charged with knowledge of its existence, or, to use the usual expression, has· had constructive notice thereof.

■ Where these essential prerequisites are shown, there can be no doubt that in this state there can be recovery, because, not only do we follow the general rule adopted in a vast majority of jurisdictions, but by statute it is made the duty of the municipality to maintain in good condition such sidewalks and curbings as the one involved here.

In Lemoine v. City of Alexandria, 151 La. 562, 92 So. 58, 59, our Supreme Court said:

"Municipal corporations owe it to the public to keep the sidewalks in such a condition that pedestrians who are ordinarily careful will not be exposed to injury. The right of the citizen to recover damages for injuries sustained by reason of the failure of the municipal corporation to discharge the mandatory duty thus imposed on it is beyond question."

We find among counsel no substantial dispute as to the law on this subject, and, therefore, deem it unnecessary to do more than to briefly refer to a few cases in which the above announced principles are recognized.

That the defect must be actually dangerous was held in Brown v. City of New Orleans, 7 La. App. 611, in which we said:

" * * * In order to impute knowledge to the city of a dangerous condition· of the' sidewalk there must, in fact, have existed a dangerous defect. The two-inch depression was not dangerous and neither actual or constructive knowledge could aggravate the defect. Sidewalks must be reasonably safe, not perfect nor foolproof."

In Wiltz v. City of New Orleans, 2 La. App. 444, appears the following:

"It is true as a general rule that the City of New Orleans is liable for an injury suffered by a pedestrian in walking over a sidewalk owing to its defective condition. But that responsibility exists only when the defective condition is dangerous or calculated to do injury. * * *"

In Goodwyn v. City of Shreveport, 134 La. 820, 64 So. 762, 763, the Supreme Court held that a municipality is not liable for the result of defects which are slight and which are not ordinarily dangerous, and set forth at length an extract from the brief of counsel for defendant, in which appeared a quotation from Beltz v. City of Yonkers, 148 N. Y. 67, 42 N. E. 401, a portion of which quotation is now repeated because it so excellently expresses the principle under discussion:

"It (the law) imposes upon municipal corporations the duty of guarding against such dangers as can or ought to be anticipated or foreseen in the· exercise of reasonable prudence and care. But when an accident happens by reason of some slight defect from which danger was not reasonably to be anticipated, and which, according to common experience, was not likely to happen, it is not chargeable with negligence."

That even for the results of obviously dangerous defects, municipalities are liable only

if the authorities have had actual or constructive knowledge thereof, is equally well settled.

In Brown v. City of New Orleans, supra, we said:

"Actual or constructive knowledge is necessary in order to charge the city with responsibility."

In Weinhardt v. City of New Orleans, 125 La. 351, 51 So. 286, 288, it is said that:

"* * * The city is not an insurer of the safety of the pedestrian, and that it must appear that the danger was owing to the negligence of the city. There is no negligence for which she can be held, unless it appears that she has been warned or notified, either expressly or by implication."

In Wiltz v. City of New Orleans, supra, is found the statement that "* * * responsibility exists only when * * * the city has actual or constructive knowledge of the defective condition."

Bearing in mind, then, the principles that, in order that there be liability in defendant, the city of New Orleans, it must appear that the defect was actually dangerous to reasonably careful persons, and that the proper city authorities had actual or constructive notice thereof, let us proceed to a consideration of the evidence on these points, first noting an interesting question which arises because of the fact that plaintiff failed to allege that, prior to the accident, the city had notice, either actual or constructive, of the defective condition of the curbing.

■ When counsel first offered evidence tending to prove that the defect had existed for some considerable time prior to the accident, this evidence was promptly objected to on the ground that the petition contained no charge that the defect had existed before the night of the unfortunate occurrence. This objection was sustained and the evidence which was at that time tendered was excluded.

Very shortly thereafter counsel for the city of New Orleans placed on the witness stand an assistant city engineer, whose duty it was to investigate complaints of defective sidewalks and curbings and to supervise the making of repairs where required. This witness, Mr. N. L. Marks, Jr., stated that prior to September, 1932, which was almost one year after the accident, he had had no knowledge of the fact that that particular curbing was in a defective condition. We take this statement to mean that at no time prior to the accident, nor, in fact, for some time thereafter, had he received notice of the defect. Mr. Maybury, the complaint clerk in the municipal repair plant, also stated that no notice had, prior to the accident, come to him, to the effect that there was a curb defect at that point.

After this testimony—that the city had not received prior actual notice of the existence of the defect—had been elicited from these witnesses for the city and without objection by counsel for the city, counsel for plaintiff again placed on the stand witnesses whose testimony was tendered to show that actual notice had been given and also that the defect had existed for so long a time prior to the accident that the city, even in the absence of actual notice, should be charged with constructive knowledge thereof. Again objection was made to this evidence on the ground that the pleadings did not contain allegations which would form the basis for the introduction of such evidence.

This time the district judge ruled as follows:

"There was evidence that before the accident the municipal repair plant had received no notice of anything being wrong with the curb at that corner. That is to prove, if it is to prove anything, that nothing was wrong with the curb at that corner before the accident. That evidence having gone in on behalf of the city to the general effect that the curb was in good condition before the accident, the plaintiff ought now to be permitted to prove the contrary, that it was not in good condition, so that I will overrule the objection."

This ruling was correct. In Novelty Neckwear Co. v. Dwyer Bros., 3 Orleans App. 415, this court said:

"* * * It is well settled that evidence admitted without objection will be considered as if it had been responsive to an allegation in an amended petition or answer filed with the consent of the opposite party. * * *"

In Taglialavore v. Caernarvon Drainage District et al., 153 La. 811, 96 So. 665, 666, we find that the Supreme Court of Louisiana, in considering a contention that certain testimony at variance with the pleadings should not have been admitted, said:

"It suffices to say, in answer to this contention, that the evidence was offered and received without opposition or objection, and therefore to the extent that it may be contradictory of the pleadings its effect is to correct and enlarge same, and it is binding upon all parties to the suit."

See, also, Houston River Canal Company v. Reid, 127 La. 630, 53 So. 887.

■ When we first gave consideration to this question as to where should be placed the burden of alleging and proving actual notice, or want of actual notice of the defect, we were struck with the thought that, since it would be most difficult, if not well-nigh impossible, for an injured person who himself has had no knowledge of the defect in question, to prove that the municipality had received such notice and that the municipality, on the other hand, should have no

difficulty in proving, in a prima facie way at least, that it had received no such actual notice, it would be most reasonable to require the municipality, as a matter of defense, to shoulder the burden of making prima facie proof of absence of actual knowledge on its part. The usual rule is that where there is, or may be, evidence which, from its nature, is difficult or impossible for one party to procure, but which is exclusively under control or may easily be obtained by the other party, the said other party must produce it, or bear the consequence of the presumption which will result from failure to do so. As to actual knowledge, such a rule would work equitable results. Here, for instance, it would require that the city, as a matter of defense, aver and make prima facie proof that its proper officials or employees had had no actual notice of the existence of the defect in question. This it might do, as it has sought to do, by placing on the witness stand the proper representatives of the department to which 'such notice should be given and by eliciting from them evidence that no such notice had been received. This would at least open the door for the rebuttal by plaintiff of, such evidence. What we have said is in regard to actual notice only and should have no application to those cases in which constructive notice must be relied on.

■ But, whatever views we may have entertained on the subject have been overwhelmed by a study of the text-writers, who, without a discussion of the reasons which we have set forth and without a careful consideration of the possible reasons for distinguishing between the burden of proof in the case of constructive notice and that in the case of actual notice, have, almost with unanimity, announced that in both cases the duty is on the plaintiff to allege and to prove notice of the one kind or of the other. Abbott, in his work on Municipal Corporations, vol. 3, § 1034, page 2329, says:

"The burden is, therefore, upon the plaintiff to both allege and prove notice or a reasonable knowledge as a condition precedent to the liability of a public corporation in acts of omission."

Edward F. White, in his well-known work, "Negligence of Municipal Corporations," § 788, page 941, states:

"As notice, express or implied, of the defect for a sufficient length of time before the accident to have enabled the municipal corporation to repair it, is one of the essential conditions on which the law predicates the liability of the corporation, it follows that, in order to state a cause of action, the declaration, complaint or petition, ought to aver, either in direct language or by the recital of equivalent facts, that the city had such notice."

In Tiller v. City of Monroe, 5 La. App. 473, our brothers of the Second Circuit said:

"The great weight of authority seems to be that the burden of pleading and proof is on the plaintiff in actions such as the present, to show that the city had notice."

However, even though the burden is upon plaintiff to allege and prove that the city had notice of the defect, since the testimony of Mr. Maybury and that of Mr. Marks as to the absence of prior notice was admitted without objection, the evidence as to actual prior notice and as to the length of time the defect was in existence is properly before us, and we now pass to a consideration of that evidence.

■■ A Mr. Parkinson, who is not shown to be in any way interested in the outcome of this litigation, stated that about two weeks prior to the day on which plaintiff, Miller, was injured, he (Parkinson) "caught my heel in that piece of iron and stumbled and scratched my knee and tore my pants a little bit and I got up * * * and later on I telephoned to the City Hall and made a report that the sidewalk was in a dangerous condition." When asked if he knew to what department he had telephoned, he said:

"I believe it was the Department of Public Property. The operator told me they would connect me with the Department of Public Property, and somebody answered the telephone, and I just made a report on it."

That such a complaint was received is denied by those employees of that department to whom such a complaint would, in the usual course of events, have come. But it is shown that no written records of such complaints are retained by that department and that, when such verbal complaints are received, they are usually transmitted verbally to the municipal repair plant. It is also shown, if, in fact, such proof is necessary, that sometimes complaints are forgotten, or overlooked. We find no reason to disbelieve Mr. Parkinson. His testimony was evidently given credence by the jury and by the district judge and we, therefore, conclude that actual notice of the defect was transmitted to the department of public property about two weeks prior to the accident with which we are now concerned. Of course, the rule is that actual notice must be given to the proper department, or to the proper officer.

"Whether knowledge of an obstruction or defect in a highway on the part of a municipal officer or employee is to be deemed the knowledge of the municipality, depends on whether or not the officer or employee has any duty to perform in regard to its removal. * * *" Ruling Case Law, vol. 13, § 283, page 345.

It is not denied that such a complaint should go to that department to which it was here made, and it is also shown that such minor repairs as were necessitated could have been made on less than two weeks' notice. In

fact, when the accident itself was reported to the department of public works, the repairs were made the next day.

We find, then, that, so far as notice is concerned, it has been proven that it was given to the proper department and at a time which afforded ample opportunity for repair prior to the day on which the accident took place.

▇▇▇▇ That the defect was dangerous even to an ordinarily prudent person seems clear.

The metal strip, if detached from its position in the edge of the curbing and viewed from its end, was in the form of a "T," the upright portion being about 1¾ inches long by about ⅜ of an inch thick, and the top, or cross-portion, which was slightly rounded on its upper side, being about ¾ of an inch across by about ⅜ of an inch thick. It somewhat resembled a small railroad rail with the base cut off. This strip should have been imbedded in the edge of the curbing in such a way that only the rounded top of the cross-portion would have been exposed to view, forming the top corner of the curbing and protecting the concrete itself from mechanical damage caused by trucks, wagons, or otherwise. One section of such a metal strip became, at one end, detached from the concrete, and was bent or twisted away from the curb —not upward, but outward—so that it did not appear as an obstruction elevated above the sidewalk, but rather extended a few inches— 5 or 6—out into the street. It was only a few feet from the corner and, therefore, directly in the path of a pedestrian walking along the sidewalk of Howard avenue and intending to cross Dryades street at the point at which pedestrians should cross. At the time of the accident, darkness of night had fallen and, although there was a street light at the corner, it did not, so the record shows, illuminate the obstruction, which was very near to the ground and very near to the curb. Of course, the bent rod could have been seen by any one who might have looked for it, but, unless one looked for it, it is easy to understand how it would not have been noticed. In its position only a few inches out from the curb, dark in color, it was a trap which might easily cause damage and it was, therefore, dangerous. Although we said, in James v. City of New Orleans, 121 So. 879, 880, that "prior accidents at the precise place where plaintiff was injured and caused by the same defect or obstruction, do not necessarily show negligence on the part of the municipality," the fact that two persons, on different occasions, fell because of this defect, though not conclusive proof of its dangerous nature, is at least suggestive of its character as a menace to life or limb.

▇▇▇▇ In McQuillin on Municipal Corporations, vol. 7, § 3013, pages 268, 269, it is said that:

"One traveling along a street may presume that it is safe. Therefore, the exercise of ordinary care does not compel him to keep his eyes under foot or looking ahead to avoid injury. A traveler need not keep his eyes fastened on the ground, nor look far ahead for defects or obstructions, nor make an active search for defects, nor look for danger at every step."

The duty of a pedestrian in such situation is discussed by the Supreme Court in Aucoin v. City of New Orleans, 105 La. 271, 29 So. 502, 503, in which we find the following:

"A person using a public highway is not bound to anticipate danger, without some notice of a condition of things suggesting a peril of travel."

To the same effect see Lemoine v. Alexandria, supra, in which the general rule is well stated as follows:

"The general rule applicable to cases of this character is that persons lawfully making use of the streets and sidewalks within the limits of municipal corporations have the right to assume that they are safe, and that, where one sustains injury by reason of the unsafe condition of such thoroughfares, the burden to show that he contributed to such injury by his own negligence rests upon the corporation. Robertson v. Town of Jennings, 128 La. 806, 55 So. 375; Buechner v. City of New Orleans, 112 La. 599, 36 So. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455; McCormack v. Robin, 126 La. 594, 52 So. 779, 139 Am. St. Rep. 549."

The condition of the curbing would not have been apparent to the casual passer-by. That it may have been seen by one whose eyes had been turned upon it does not require, as a necessary corollary, that if a passer-by failed to see it, he would be chargeable with contributory negligence. Pedestrians are not required to be constantly on the alert for possible dangers due to defective streets and need only see those dangers which are apparent and which would present themselves to the eye of a reasonably prudent person. The failure of plaintiff to see and his consequent neglect to avoid this danger do not constitute contributory negligence on his part. See Rock v. American Const. Co. et al., 120 La. 831, 45 So. 741, 742, 14 L. R. A. (N. S.) 653, in which it was held that a pedestrian is justified "within reasonable limits" in assuming that the street on which he walks is safe. See, also, Nessen v. City of New Orleans, 134 La. 455, 64 So. 286, 51 L. R. A. (N. S.) 324.

▇▇▇▇ We feel, as we did when we considered the matter of Shally v. N. O. Public Service et al., 1 La. App. 770, that "the gravity of the injury suffered by the plaintiff and the very large amount claimed in the petition and allowed in the judgment * * * give this case more than ordinary importance and

demand more than ordinary consideration." We have, therefore, been particularly careful to study in detail the testimony of the medical experts with reference to the physical injuries sustained by the unfortunate plaintiff. There was a "compression fracture" of the "first lumbar vertebra." Plaintiff was first admitted to the hospital on October 12, 1931, where he remained for about five weeks. He returned on three occasions for replacement of the cast within which his entire torso was encased, and, at the time of the trial, February 7, 1933, which was nearly sixteen months after the accident, he was still required to wear the cast. While he could walk without crutches, his movements were, of course, limited to those of absolute necessity. All the physicians agree that he must have suffered extreme pain and that the constriction of the cast during the great length of time he was required to wear it must have been agonizing in the extreme. He had been for years a structural steel worker, earning more than the average daily wage, his monthly earnings being usually about $200. The doctors, who, as experts, testified on behalf of defendant, stated that they felt certain that plaintiff would ultimately recover completely.

Because of the serious nature of the injuries, we feel it advisable to quote at some length from the testimony of these medical experts. Dr. Ficklen's evidence with reference to the injuries and the probable duration of disability is, in part, as follows:

"Q. I want to know, Doctor, whether he is permanently injured, in your opinion? Could he get well? A. I can answer yes by stating that those fractures of the spine without involvement of the spinal cord—that is, without injury to the essential nerve element within the spinal cord—are curable. There are numberless instances of perfect functional cure after fracture of the spine.

"Q. Are you finished? A. Yes, sir.

"Q. Doctor, what is the treatment generally used for injuries of this kind? A. The first treatment? This man's treatment has followed the exact and accepted line of modern treatment. At first he was put on what is known as a Bradford frame, which consisted of a frame-work of gas pipe with canvas stretched over it, and he was put in such a position as to hold the spine in extension. In other words, if a man is bent backwards, his spine is said to be in extension. If he is bent forward, his spine is said to be in flexion. He was kept on this Bradford frame for a few weeks, and after that a series of casts has been applied, in order to allow this fracture to heal and to allow fusion between this particular bone in the spinal column and the two adjacent bones.

"Q. Now, Doctor, in the event that the treatment or use of a cast be not successful, is there any operation for the injury such as the spine is suffering from? A. Yes, sir. If the ordinary measures of immobilization do not succeed, then there are two operations, one of them advised by a Doctor Albee, which consists of a bone graft operation at the sides of the fracture, and another one known as the Hibbs operation, which consists in a fusion of the vertebra without bone grafting. These operations are used if other devices fail to give the patient relief from pain.

"Q. Then the chances of success in the operations which you have mentioned—ordinarily what is the average of success? Is it considered a very risky operation, or are the chances of success good? A. No, it is not considered a very risky operation. The spinal canal is not invaded.

"Q. Doctor, I may have asked you this question, but I am going to ask you again: In your opinion as an expert will Mr. Miller get well? A. Yes, sir.

"Q. And can you estimate or approximate the period of his disability from now on? A. I can only roughly approximate. From the records and from my examination, I should say that it would take anywhere from one year to two years to get him well."

Dr. D. M. Stewart gave testimony very similar to that of Dr. Ficklen:

"Q. Do you mean an entire cure, when you say a good result? A. I mean an entire cure, with no resulting disability.

"Q. After the removal of that cast, do you think there would be much chance of his regaining his physical ability after the removal of that cast? A. Well, in most cases that we have seen and handled, they regained usually their full disability (ability). I have several cases in mind.

"Q. Do you think—to what extent, if any, do you think a man with such a spinal injury and having received such a treatment would be handicapped in the pursuit of the occupation of structural steel worker, by which I mean men accustomed to climbing these steel structural buildings and placing steel in place? A. I think that if the man were to recover, or granting that the patient would recover from treatment, other than the so-called mental hazards, I don't see where it would hinder him at all in that particular line of endeavor.

"Q. So that he would have a backbone after this recovery substantially the same as before? A. Yes, sir, and in many instances it would be—after a short period of time it would be almost impossible to tell whether or not the man had an old fracture there, because of the expansion of the vertebra."

Plaintiff and his counsel entertain the view that the doctors, who, as experts, testified on behalf of defendant, are mistaken in the opinion which they have reached that plaintiff

will ultimately entirely recover from his injuries. However there is no medical testimony to contradict or overcome the effect of that given by Dr. Ficklen and Dr. Stewart. The doctors, who at the Charity Hospital were in charge of plaintiff's case and who testified as to the treatments accorded him, were unwilling to give expert testimony, and, therefore, even if they are of the opinion that plaintiff's recovery will never be complete, they did not say so while on the witness stand. Their unwillingness was due to the fact that they felt that they should not be required to testify as experts unless guaranteed that they would be compensated for their services as such. No arrangements were made for such guarantee and, therefore, their views on the permanency of the injuries are not before us. We have nothing to show that, even if they had testified as experts, their opinions would have supported that which is entertained by plaintiff and his counsel. In the absence of any countervailing opinion, we can but accept that of the experts who, on behalf of defendant, very plainly expressed the view that the recovery will ultimately be complete.

We have been shown no case and have been able to find none in which the injuries complained of resembled those sustained by plaintiff. From the time of the accident to the time of the trial, he had lost, in actual earnings about $3,000, and, even if his recovery is as certain as the doctors think it will be, this actual loss will be increased to at least $5,500 before he can return to gainful employment. His sufferings were, no doubt, intense during the early stages of his treatment. Almost every physical function has been impaired or interfered with and his extreme inconvenience in walking, sleeping, or even sitting down have been certainly sufficient to exhaust the patience of a "Job." Such sufferings cannot be measured accurately in money. We are not permitted to let our sympathies sway us in estimating the amount in dollars and cents which will be required to compensate for them. We have given some study to several cases decided by this and other courts in which serious injuries and excruciating suffering were involved, and, while, we appreciate, as we have said, that each case must stand upon its own bottom and that no one case can form an accurate yardstick by which any other case may be measured, nevertheless, since there must be some uniformity, we have endeavored to arrive at a figure which will not be manifestly excessive nor inadequate, when considered in comparison with the amounts awarded in the cases which we have in mind and to which we shall now refer.

In Shally v. N. O. Public Service et al., supra, this court allowed and the Supreme Court sanctioned an award of $25,000 to a young man who sustained the loss of both legs.

In Leininger v. N. O. Ry. & Light Co., 150 La. 1089, 91 So. 521, the same amount, $25,000, was allowed to an older man who lost both legs, they being amputated below the knees.

In Dougherty v. N. O. Ry. & Light Co., 127 La. 225, 53 So. 532, 533, an award of $5,000 was increased by the Supreme Court to $7,500. The court said:

"From a healthy, able-bodied man, of considerable earning capacity, with a fair promise of a goodly part of his allotted span of life yet before him, plaintiff has been converted into a physical wreck, to whom any greater exertion than moving 'out of a rocking chair to a lounge' may prove instantly fatal, and destined to spend his remaining days in continual pain more or less acute."

In Landry v. McNeil Hunter Motor Co., 11 La. App. 380, 122 So. 293, 295, the Court of Appeal for the Second Circuit considered a case in which the sufferings of the plaintiff were no doubt very great. The court said:

"It appears from the evidence that both of plaintiff's legs were broken and that he was compelled to undergo several surgical operations, the last of which consisted of placing a Lane plate where the ends of a bone had failed to properly unite."

The amount allowed was $7,500.

In Tarleton-Gaspard v. Malochee et al., 16 La. App. 527, 133 So. 409, 414, we reduced to $15,000 an award of $27,500. The suffering of the plaintiff, a woman of mature age, we felt was at least as great as that in any case with which we were then, or are now, familiar. We said:

"The accident happened on October 19th, about 7 o'clock p. m., and within an hour she was removed to Charity Hospital, where her left leg was removed about five inches below the knee by a Guillotine operation. It was necessary to leave the wound open in order to pull the flesh and skin down over the end of the stump to cause proper healing. The weights used for this purpose were suspended by pulleys and remained in that position for about 54 days. The other leg was in a plaster cast, which was from time to time removed and replaced, as well as the splints on her left arm. The patient was in 'an extreme state of shock,' and it was necessary to give her transfusions on account of loss of blood. She entered the hospital on October 19, 1929, and was discharged on January 20, 1930, but was confined, at first, to her bed at home, and thereafter partially confined to her bed. Even until the time of the trial she was required to use crutches, with the assistance of some one to support her while using them."

In Anderson v. Geo. A. Hormel & Co. et al., 18 La. App. 398, 136 So. 906, 908, an award of $3,000 was made for the pain and suffering of a man who sustained two fractures of the

left arm and received other injuries about the body and who "was operated on seven different times for the serious arm fracture, six of which operations had to be performed under general anæsthesia." The court in that case said:

"In the light of all the testimony we have on the question of pain, it is hard to conceive of a case in which there could have been more than was endured by this plaintiff, and he certainly is entitled to the amount asked for by him and allowed by the district judge."

In Koch v. Southern Cities Distrib. Co. et. al., 18 La. App. 664, 138 So. 178, 182, the injuries and sufferings were described as follows:

"Plaintiff, at the time of his injuries, was 38 years of age, enjoying good health, and was earning $250 per month. The explosion rendered him unconscious. He was lacerated and torn about the body, and his nose and right foot broken. The lacerations, contusions, and bruises about the body were so numerous that, when the wounds were dressed, he was scarcely recognizable by his friends. He remained in the hospital for about a month, was taken home, where he remained in bed two months more. At the date of the trial, some fifteen months later, he was under the care of a specialist for his nervous condition and a bone specialist for his foot. His nervous condition is such that he is compelled to take sedatives to induce sleep. We infer from the testimony that he is now almost a nervous wreck, and that it will be a long time before he can recover, if he ever can. In the meantime, he has endured and will continue probably for a long time to come to endure great physical pain and mental suffering."

The court allowed $15,000 for injuries and the actual expenses.

In Leiser v. Thomas et al. (La. App.) 150 So. 81, 84, in discussing the injuries to plaintiff, we said the following:

"There was also a compressed fracture of the eleventh dorsal vertebra of a crushing nature that caused a protrusion of the spine at that point. This injury was treated by placing her on her back on a Bradford frame, where she had to lie for 4 weeks. A plaster of paris jacket covering the entire trunk of her body, from the chest to her hips, was then applied, and was permitted to remain on her for 4 weeks. Up to the time of the trial she wore a back brace made of steel and cloth, which is uncomfortable. While the doctors thought in was possible for her to develop a hump in her back, it was their opinion that there was nothing in her condition to indicate that it was probable. We conclude that the injury to her back was severe and painful, but is not permanent.

"The hospital, nurses', and doctors' bills, amounting to $1,706, were not contested, and therefore are allowed. Without attempting to itemize the damages, we have decided to allow plaintiff the sum of $5,000."

In the case before us the actual expenses were not great, because plaintiff has been treated entirely at the Charity Hospital. No claim is made therefor except to the extent of $95 for room rent. We have concluded that, under all the circumstances, $6,500 should be allowed plaintiff in addition to the amount of actual loss of earnings, which we fix at $5,500, making a total award of $12,000.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended by reducing the amount thereof to $12,000, with legal interest from judicial demand and for all costs in both courts, and, as thus amended, it is affirmed.

Amended and affirmed.