LANDRY, Judge.
Plaintiff, George Briley, brings this action ex delicto seeking judgment in solido against defendants, Thomas Smith; Bituminous Casualty Corporation (Smith’s liability *451 insurer) ; J. W. Low, Inc., Leon Huckaby, employee of J. W. Low, Inc., North River Insurance Company in its capacity as Low’s insurer; and All State Truck Lines and its liability insurer, American Fidelity and Casualty Company, Inc.; for personal injuries and medical expense sustained and incurred as the result of an accident involving (1) a Plymouth Station Wagon owned by defendant, J. W. Low, Inc., and being driven at the time by its employee, Leon Huckaby, and accompanied by plaintiff as guest passenger; (2) a truck and trailer owned by defendant, All State Truck Lines and being operated by its employee, Clarence Dixon, Jr.; and (3) a truck and trailer owned and operated by defendant, Thomas Smith.
In the court below judgment was rendered in favor of plaintiff against all defendants, in solido, in the sum of $13,000.00 for personal injuries and $3,200.00 medical expense. From said judgment all defendants have appealed suspensively.
The accident giving rise to this lawsuit occurred shortly past midnight, more precisely at about 12:30 A.M., April 24, 1959, approximately five miles east of the Atchafalaya River on that segment of U. S. Highway 190, Pointe Coupee Parish, Louisiana, known as the Morganza Spillway Bridge which structure is in effect a high level crossing of that portion of the Atchafalaya Swamp embracing the flood control project known as East Atchafalaya Spillway. The Morganza Spillway Bridge, approximately five miles in length, consists ■of an elevated four lane concrete highway, each lane being approximately twelve feet in width, constructed upon piers much in the nature of a bridge to raise the highway above the swamp which it traverses. The highway runs generally in an easterly-westerly direction, the two westbound lanes being separated from opposing traffic by a median concrete balustrade or barrier approximately three feet in height. On either side of the bridge is situated a decorative concrete railing. The highway, being in essence a bridge, has no shoulder whatsoever. From the foregoing it will readily appear the bridge in effect consists of two 24 foot roadways, one devoted to westbound and one to eastbound traffic, separated by an insurmountable concrete barrier which precludes eastbound traffic from entering the westbound lanes and vice versa.
On the night of the accident defendant, Thomas Smith, was driving his vehicle, a White truck, drawing an enclosed, unpainted aluminum van or trailer, loaded with cases of beer, westerly along Highway 190 in the right of outside westbound lane. As his vehicle neared the eastern end of the spillway bridge its engine commenced to sputter and fail but the truck proceeded forward a distance of approximately one-quarter mile west of the east end of the bridge at which point it stopped. Before the truck came to a complete rest, Smith directed the vehicle as closely as possible to the right bridge railing so that the truck and trailer came to a halt completely in the right or outside westbound lane leaving the inside lane open for the passage of westbound traffic. It subsequently developed Smith’s truck had run out of gas because of a ruptured fuel line. Thereafter, the westbound truck of defendant, All State Truck Lines, Inc., pulling a trailer loaded with large metal culverts painted black with tar or asphalt and being operated by Dixon, was flagged by Smith. In response to Smith’s distress signal, Dixon stopped his vehicle in the left or inside westbound lane abreast of Smith’s stationary vehicle thus completely and effectively obstructing both westbound traffic lanes. The highway being impeded 'as indicated, the westbound Plymouth Station Wagon in which plaintiff was riding as guest passenger, crashed into the rear of the All State Truck Lines vehicle, the top of the station wagon striking the ends of the culverts which extended a distance of approximately two and one-half feet beyond the trailer on which they were being transported. The above narrated circumstances are readily conceded by all parties.
*452 For the sake of brevity, the trucks belonging to defendants, Smith and All State Truck Lines, will sometimes hereinafter be referred to simply as the “beer truck” and the “pipe truck”, respectively. For similar reasons All State Truck Lines, J. W. Low, Inc., North River Insurance Company, American Fidelity and Casualty Company, Inc., and Bituminous Casualty Corporation will sometimes hereinafter be referred to as “All State”, “Low”, “North River”, “American”, and “Bituminous”, respectively.
Plaintiff maintains the accident and injuries he sustained therein resulted from the combined negligence of Smith and Dixon coupled with the fault of plaintiff’s host driver, Leon Huckaby. In essence plaintiff avers Smith was negligent in permitting his vehicle to run out of gas, stopping his vehicle upon a public highway at night without setting out warning flares as required by law, operating his vehicle at night without adequate rear lights and failing to flag the approaching station wagon and warn it of the presence of the pipe truck blocking the left or passing lane. The asserted liability of All State is predicated upon the alleged negligence of its driver, Dixon, in operating his vehicle upon a public highway at night without proper rear lights, stopping in the left or passing lane, failing to set out flares after stopping a truck upon a public highway and failing to warn the approaching station wagon of the presence of his truck in the left or passing lane of travel. The negligence of plaintiff’s host driver is alleged to consist of his traveling at an excessive rate of speed, failing to have his vehicle under proper control, failing to maintain proper lookout, failing to see the trucks stopped on the highway, failing to reduce his speed as he approached the stationary vehicles and failing to stop in time to avoid the accident.
In defense of plaintiff’s action each defendant asserts his own freedom from negligence and ascribes the accident solely and exclusive to the fault of the other defendants.
Smith and his insurer contend the beer truck was properly lighted and also that Smith, upon stopping, immediately set out warning flares, one at a distance of approximately 60 feet to the rear of the beer truck and another at the back of the trailer. It is also contended Smith parked his disabled vehicle as close as possible to the right or outside bridge railing leaving the left or inside lane of travel free and unimpeded. Said defendants further maintain the beer truck was fully and adequately lighted. In addition to the negligence attributed by plaintiff to Huckaby, defendants Smith and Bituminous charge Huckaby with operating a vehicle under the influence of intoxicating liquor. Dixon is charged by Smith and Bituminous with negligence in stopping his vehicle in the passing lane and operating the pipe truck at night without proper lights. In the alternative plaintiff is charged with contributory negligence in riding with Huckaby who was intoxicated and failing to warn his host driver of the danger presented by the circumstances which should have been obvious to any one proceeding upon the highway.
Defendants, All State and American, contend the accident resulted solely from the negligence of Huckaby in driving at excessive speed, failing to have his vehicle under control and driving while intoxicated. In the alternative, said defendants charge plaintiff with contributory negligence in the same respects alleged by defendants, Smith and Bituminous.
On behalf of defendants, Low and North River, it is contended Huckaby was free of negligence and the accident resulted solely from the negligence of Smith and Dixon in the same respects as charged by plaintiff, Briley.
Our careful analysis of the voluminous transcript of evidence adduced on the trial of this cause (consisting of some 575 pages of testimony together with depositions and exhibits) leads to the following conclusions: (1) The accusation of intoxica *453 tion hurled at Huckaby is utterly without foundation in the record; (2) The beer truck was fully lighted and was properly parked in the right or outside lane of travel; (3) The only issues regarding Smith’s alleged negligence are whether he failed to set out warning flares as required by law and whether he was remiss in not flagging the approaching station wagon and warning Huckaby of the presence of the pipe truck in the passing lane; (4) Dixon was either parked in the left lane or was in the process of slowly moving his truck ahead after having stopped abreast of the Smith vehicle—in any event, the rear of his truck was blocking the left lane of travel at the moment of impact and (S) The only disputed issues concerning Dixon’s alleged negligence is whether the rear of the pipe trailer was equipped with lights as required by statute.
The record establishes substantially that at the time of the accident Huckaby, accompanied by plaintiff and four other acquaintances, was enroute to Opelousas, Louisiana, where the occupants of the station wagon resided. The party had attended a dinner upon invitation extended by a salesman who called upon Huckaby’s employer, Low, which said employer operated a chain of department stores in the Opelousas area. Plaintiff and his associates arrived at a night club and restaurant known as Candlelight Inn, an establishment situated on U. S. 190, a short distance west of the Mississippi River Bridge, at approximately 8:30 P.M., the evening of the accident. After partaking of a steak dinner preceded or accompanied by one cocktail or beer each, the party left the Candlelight Inn to witness a different floor show at an adjoining establishment and while so engaged one additional drinlc was taken. At approximately midnight, plaintiff and companions returned to their automobile and commenced the return journey to Opelousas with Huckaby driving the station wagon. The record is barren of proof that Pluckaby or any other member of the party drank to excess on this occasion. No witness, not even Dixon, Smith or the state trooper who investigated the accident shortly following its occurrence, testified Huckaby was under the influence of alcohol and, more significantly, no witness stated the odor of alcohol was detected upon Huckaby’s breath after the accident. In short, our perusal of the record discloses no serious attempt was made to establish Huckaby’s alleged intoxication.
Regarding the lights on the rear of the beer truck, the record establishes beyond question said vehicle was more than adequately lighted. Both Smith and Dixon so testified and in this regard they are fully corroborated by plaintiff and Huck-aby both of whom testified they observed the lights on the beer truck while the station wagon was still a considerable distance away.
Smith’s alleged negligence in permitting his truck to run out of fuel is similarly not established by the record. On the contrary, the unconverted testimony of Smith is to the effect he discovered a broken fuel line upon examination of his truck after it sputtered to a halt upon the spillway bridge. In this regard his testimony is corroborated by Dixon and Trooper Jou-bert who assisted Smith in repairing the line and siphoning fuel from Dixon’s truck to provide gas in order that Smith might proceed to the nearest service station following the accident.
From the evidence it is clear beyond question the beer truck was parked entirely in the right or outside lane of travel. All witnesses so testified and there is no dispute on this issue. There is, however, violent dispute concerning whether Smith set out flares after his truck stopped. In essence appellee maintains Smith failed to put out any flares whatsoever and, alternatively, the flares set burned out prior to the accident and Smith negligently failed to replace them. Our view of the record, however, leads to the conclusion Smith did *454 in fact set out flares which were burning at the time of the accident and our learned brother below erred in holding otherwise.
In substance Smith testified that when his truck stopped he pulled as far to the right as possible and then dismounted with two flares which he lit. He walked back a distance of approximately 60 feet and dropped one burning flare in the approximate center of the westbound lanes and then returned to his vehicle dropping the second flare at or near the rear end of the trailer. After setting out his flares, he then went to the front of the truck and upon raising the hood and examining the engine found the fuel line had broken at the point where it enters the. carburetor. Smith then took out an electric lantern and attemped to stop a passing motorist to enlist aid. After approximately fifteen minutes Dixon came along and stopped his truck abreast of the beer truck.' After advising Dixon of his difficulty, Smith noted the station wagon approaching from the east and suggested Dixon' drive his vehicle forward and park it in the right lane ahead of the stalled beer truck. As Dixon began to pull slowly ahead the oncoming station wagon crashed into the rear of the pipe truck, the top front of the automobile striking the end of a culvert protruding beyond the bed of the trailer.
Dixon testified he observed both flares burning as he approached' the beer truck which was parked entirely in the right lane of travel. He observed Smith signaling a stop with a red lantern and brought his vehicle to a stop abreast of the beer truck as he did not then know whether Smith’s signal was a call for assistance or was intended as a warning of some unsafe condition of the highway ahead. He inquired of Smith as to the difficulty and was informed Smith’s vehicle had run out of gas due to a broken fuel line. Dixon then volunteered to attempt to siphon gas o.ut of his own vehicle to provide fuel for Smith’s disabled truck. At this time Dixon looked to his rear and observed an oncoming vehicle which appeared to be a safe distance away. He then began to move slowly forward to park in the outside lane ahead of Smith’s disabled truck and when the rear of his trailer was approximately even with the tractor (the truck portion of Smith’s truck and trailer) the westbound station wagon collided violently with the rear of his vehicle striking the end of a culvert and then bouncing off and striking the side of the beer truck.
Paul Groebe, a westbound motorist who arrived upon the scene very shortly following the occurrence of the accident, stated the Huckaby station wagon passed him at high speed approximately two miles east of the point of the accident. Upon approaching the site of the accident he observed the fully lighted beer truck in the outside lane of travel and also noted two flares, one approximately 50 feet to the rear of the beer truck and another at some point near the trailer of the Smith vehicle. He had no difficulty in seeing either the parked beer truck nor the flares which Smith had set. Although counsel for Smith and Dixon both vigorously attacked Groebe’s testimony regarding the time interval elapsing between the passing of Groebe’s vehicle by Huckaby and Groebe’s subsequent arrival at the accident scene, in our opinion, the evidence preponderates in favor of the finding Groebe arrived at the scene between two and three minutes following the impact. While it is true at one point in his testimony Groebe indicated the station wagon passed him approximately five minutes before his arrival at the scene of the accident, his testimony, as a whole, indicates he was traveling approximately 50-55 miles per hour and the station wagon passed him while he was approximately two miles from the point where the accident occurred. Groebe was positive the flares were burning upon his arrival.
Trooper Joubert, who investigated the accident, arrived approximately 25 minutes after the collision. Although he found flares burning at the time, his testimony in this regard is of little weight considering Smith conceded he replaced the flares *455 which burned out some time after the collision occurred. Smith further acknowledged he replaced the flares prior to Joubert’s arrival at the accident site.
Plaintiffs, Huckaby and John Ortego, (the latter a guest passenger in the station wagon), in substance testified they were looking ahead at the time of the accident and observed the lights on the beer truck but saw no flares and no lights on the rear of the pipe truck. Their testimony is purely negative in character and in our opinion does not. preponderate over that of Smith, Dixon and Groebe especially when we consider Groebe to be a totally disinterested witness and it would be clearly to Dixon’s interest to inculpate Smith of negligence in failing to set out flares.
We find no merit in the charge Smith was negligent in failing to flag the oncoming station wagon and warn its driver of the presence of the pipe truck in the passing lane. On this score the record discloses Smith had no control over the pipe truck and was not responsible for the driver stopping that vehicle in the passing lane. Dixon remained in his vehicle from the time he stopped until the moment of impact. Moreover Smith was on the lookout for approaching vehicles as evidenced by the fact he advised Dixon of the approach of the station wagon although he, Smith, believed there was no emergency as he considered the overtaking automobile to be sufficiently distant as to be in no danger of colliding with either truck. Smith’s vehicle was not improperly parked — as here-inbefore shown, it was on its proper side of the road, fully lighted and with flares set to warn and alert westbound motorists of its presence.
Dixon concedes he stopped in the passing lane opposite the disabled beer truck and was advised by Smith that the latter’s vehicle had run out of fuel. His testimony is to the effect the pipe truck was adequately lighted in that it was equipped with tail lights at the rear of the trailer bed as well as running lights. In addition Dixon statéd before leaving his employer’s place of business he personally installed an electric light having a red glass lens approximately four inches in diameter to the end of a pipe which extended beyond the rear of the trailer bed. He further stated he affixed a string of four running lights to the rear of the trailer and also attached a red flag to the end of one of the overhanging culverts. In this respect, however, he is contradicted by Trooper Joubert whose testimony shows upon examination the trailer was found to have tail lights but no flag, four inch light or running lights at the rear as maintained by Dixon.
Considering the nature of the load being transported and conceding the trailer of the pipe truck was equipped with tail lights, nevertheless, we are of the opinion the pipe truck trailer was inadequately lighted under the circumstances. It will be recalled the pipe truck was loaded with large metal culverts which were black because of their tar coating and which did not present a solid surface to one approaching from the rear inasmuch as the record indicates the culverts were loaded with their length parallel to the length of the trailer, consequently an overtaking motorist was in effect looking into the culverts as he approached from the rear. It must also be recalled the culverts overhung the rear of the trailer and therefore, no doubt to some extent obscured the tail lights on the rear of the trailer bed.
In seeking to absolve Dixon of liability learned counsel for All State cites and relies upon that line of jurisprudence which holds a motorist colliding with the rear of a vehicle proceeding in the same direction must, to avoid responsibility, show the existence of unusual circumstances citing as authority for such position the well known case of Gaiennie v. Cooperative Produce Co., 196 La. 417, 199 So. 377; and also Washington Fire & Marine Ins. Co. v. Travelers Indemnity Co., La.App., 86 So.2d 743; Pacific Indemnity Co. v. Cavalier, La.App., 97 So.2d 502 and McCain v. Tat *456 man, La.App., 53 So.2d 187. Our careful reading of the cited cases reveals none are apposite considering neither of said decisions involved factual situations wherein a motorist ran into the rear of a vehicle parked in the left or passing lane.
We have little difficulty in concluding Huckaby was negligent in either driving at an excessive rate of speed or failing to maintain a proper lookout, or both.
Huckaby testified he was proceeding westerly at a speed of 60-65 miles per hour with his headlights on low beam. The night was dry and clear and there was no oncoming eastbound vehicles whose lights affected his vision to any extent. When approximately one-half mile distant he observed the lights on the rear of the beer truck in the right or outside lane ahead. As he overtook the beer truck he believed it to be in motion and when he reached a point about 300 feet from the rear of the truck he pulled into the left or passing lane preparatory to passing the truck. Huckaby saw no flares nor did he at this time note the presence of the pipe truck in the passing lane. When he reached a point he estimated at approximately 200 feet to the rear of the pipe truck (at which time he was in the passing lane) he then for the first time noted what he considered to be a reflection and simultaneously noted the headlights of the pipe truck shining on the road ahead. He believed the pipe truck to be in motion but instantly realized it was stopped and he thereupon immediately slammed on his brakes. Huckaby stoutly denied noting any flares upon the highway and also denied there were any lights of any nature whatsoever on the rear of the pipe truck or the ends of the culverts with which it was laden. Although Huckaby, plaintiff and Ortego deny plaintiff was exceeding the lawful speed limit as testified by Groebe who estimated Huckaby’s speed at 90-100 miles per hour when Huckaby passed him two miles east of the point of collision, nevertheless we believe the record establishes Huckaby’s speed was in excess of the legal maximum. Despite the testimony of plaintiff and Huckaby to the effect Huckaby applied his brakes, Trooper Joubert testified he examined the surface of the highway and found no evidence of skid marks preceding the point of impact nor any other skid marks whatsoever. Moreover both Dixon and Smith denied hearing the sound of brakes before the collision. We believe the foreg'oing establishes Huckaby was traveling faster than he estimated and also that he was nearer than 200 feet distant from the pipe truck when he attempted to apply his brakes. Had he been traveling merely 50-55 miles per hour and attempted to apply his brakes while 200 or even 150 feet distant from the pipe truck, there would have been sufficient reaction time for his brakes to take effect and leave at least some skid marks. While it may well be that Huckaby did in fact attempt to apply his brakes, for the reasons set forth we are inclined to believe he actually observed the pipe truck when he was so near there was insufficient time for application of his brakes.
We conclude Huckaby was negligent in not observing the flares set out by Smith and reducing the speed of his vehicle. Had he been traveling at a lawful rate of speed and maintaining a proper lookout he would have seen what he should have seen, namely, the flares which would have alerted him to possible danger ahead and prompted him to reduce his speed and bring his vehicle under such control as would have enabled him to stop in time to . avoid an accident. Although we are convinced the rear of the pipe truck was inadequately lighted under the circumstances, nevertheless the record establishes there were tail lights on the rear of the trailer. Even though the tail lights of the trailer were probably somewhat obscured by the nature of the load, nevertheless had Huckaby reduced his speed and maintained a sharp lookout upon noting the flares which he should have seen, he might have detected the presence of the pipe truck *457 in time to stop, provided of course, his speed permitted.
Granting, as contended by counsel, Huckaby was not charged with anticipating the presence of an unlighted or improperly lighted vehicle stopped in the passing lane, nevertheless Huckaby is not relieved of the duty of constantly maintaining a sharp lookout ahead. Under the circumstances obtaining in the instant matter, if Huckaby had heeded the inference of danger to be drawn from the presence of flares upon the highway he should have both reduced his speed and increased the vigilance and sharpness of his lookout. By his own admission he did neither. It is elementary that the presence of warning flares upon a public highway at night is a sign of potential danger and a motorist confronted with such an omen of possible peril must expect to encounter extraordinary circumstances and prepare for a possible emergency. We are convinced Huclc-aby’s failure to do anything except proceed at unreduced speed under the circumstances was a proximate cause of the accident.
Nor does the negligence of Dixon in parking the truck in the passing lane and operating same without proper lights exonerate Huckaby of liability herein. While we consider the action of Dixon negligence of the grossest sort bordering upon criminal culpability considering the circumstances shown, nevertheless his derelictions merely combined with those of Huckaby to produce the injury of which plaintiff complains, rendering said parties and their insurers liable to plaintiff in solido.
Defendant’s charge of contributory negligence on the part of plaintiff are not substantiated in the record. We have already shown the contention Huckaby was intoxicated is without foundation. Regarding the accusation of excessive speed on the part of Huckaby, we are of the opinion that whereas he was in fact exceeding the lawful speed limit his speed was not so excessive as to render plaintiff guilty of contributory negligence in riding with him without protest under the circumstances. In this connection there is not one scintilla of evidence to the effect Huckaby was driving in such manner or at such speed as to give his guests cause for alarm or fear for their safety.
There remains only the issue of quantum. Our esteemed brother below awarded plaintiff judgment in the sum of $13,000.00 for personal injuries and counsel for defendants maintain the amount is excessive and should be reduced. Plaintiff did not answer the appeal but was content to argue in brief the award was proper and should be sustained on appeal.
Appellants maintain the trial court’s award is excessive inasmuch as plaintiff’s medical history is that of a psychoneurotic and plaintiff is exaggerating the effects of his injury which consisted primarily of a fracture of the second cervical vertebrae.
The record supports the contention appellant is “accident prone” and has for years been what in medical terminology is known as a psychoneurotic personality. At the time of the accident plaintiff was suffering from an old back injury sustained long prior to the accident. Due to said initial back injury and subsequent accidental aggravation thereof plaintiff, prior to the accident, had disc surgery upon two occasions, a lumbo-sacral fusion and numerous episodes of neurosis. Despite such medical background, however, plaintiff had been variously employed as carpenter, handyman, service station operator, mechanic and operator of a proprietary package (patent medicine) drug store. Although the record is' barren as to the earnings of plaintiff in such endeavors, it is conclusively established plaintiff worked at some form of undertaking or another whenever his health permitted. His operation of the drug store extended from 1948 to 1954 and terminated only when the building in which his business was conducted burned to the ground. During 1954-1956 plaintiff was self em *458 ployed as an automobile mechanic and also raised some cattle on rented land. In the interval 1956-1959, plaintiff was engaged in. operating a service station in partnership with his brother for part of this period and at the time of the accident was engaged in doing carpenter work at one of the stores of J. W. Low, Inc.
Dr. Moss Bannerman, who examined plaintiff on one occasion only, namely, May 29, 1962, confirmed the finding plaintiff sustained a fracture of the second cervical vertebrae in the accident of April 24, 1959. He found plaintiff to be complaining of pain in the back and neck from the shoulder blades upward, stiffness of the neck and weakness and numbness of the right arm and hand. He observed a marked tilting of plaintiff’s head to the right and noted plaintiff was wearing a back brace at the time. Predicated upon plaintiff’s narration of prolonged history of back trouble and other difficulties, Dr. Bannerman diagnosed plaintiff’s condition as psychoneurosis and possible nerve root pain in the right side secondary to the cervical injury sustained in the accident of April 24, 1959. Dr. Banner-man concluded plaintiff’s complaints of pain had no physical basis although he believed plaintiff to be still suffering some residual disability of the neck and right arm attributable to the accident in question. He could not, however, explain the reason for plaintiff’s head tilting to the right nor could he relate this condition to any injury suffered by plaintiff in the accident in question.
Dr. Emile K. Ventre, Physician, testified he had been plaintiff’s family physician for approximately 10 years preceding the accident. Prior to the accident Dr. Ventre saw plaintiff an average of 2 to 4 times annually primarily for back pain caused by aggravation of plaintiff’s old back injury by accident or over-exertion. Following the accident plaintiff was referred to Dr. Ventre by a Dr. Owens who treated plaintiff in the hospital. At this time Dr. Ven-tre found plaintiff to be in great pain and unable to hold his head erect. Examination revealed plaintiff sustained a fracture of the second cervical vertebrae on the right side. Plaintiff was placed in traction for approximately four weeks following which he wore a neck brace until about July 15, 1959. In the opinion of Dr. Ventre plaintiff has some nerve root pressure on the second cervical nerve which produces some of the pain about which plaintiff complains. For a considerable period following the accident Dr. Ventre prescribed pain relievers and for approximately 18 months preceding trial plaintiff has taken tranquilizers upon Dr. Ventre’s prescription. According to Dr. Ventre, plaintiff still has some spasm of the neck muscles and has developed torticollis or wryneck which means the muscles of the neck are affected to the extent the head is pulled down upon the shoulders and the person afflicted cannot hold his head erect. Dr. Ventre considers plaintiff totally and permanently disabled and has noted a complete personality change in plaintiff since the accident. In the opinion of Dr. Ventre there is no question but that plaintiff has become hypochon-driacal since the accident. Between the time of the accident and trial of this cause, Dr. Ventre’s records indicate plaintiff consulted him on approximately 290 occasions. Dr. Ventre frankly stated plaintiff’s injuries, superimposed upon plaintiff’s psychoneurotic background, was “the straw that broke the camel’s back” and has rendered plaintiff a physical as well as mental invalid.
Plaintiff produced several lay witnesses, including his wife, friends and acquaintances, all of whom corroborated plaintiff’s complaints of constant pain following the accident. In general, these witnesses sub-stántiated Dr. Ventre’s testimony concerning plaintiff’s personality change subsequent to plaintiff’s injury and also confirmed plaintiff’s inability to work or engage in any gainful employment.
Notwithstanding plaintiff’s failure to establish his income preceding the accident, under the circumstances shown, we do not consider the award of the trial court for personal injuries to be excessive *459 in this instance. The record establishes plaintiff has suffered constantly since the accident and will no doubt do so for an indefinite period in the future. Conceding plaintiff to be of a neurotic nature — even conceding him to be psychoneurotic, such admission can be of little comfort to defendants. It is well settled the tort-feasor takes his victim as he finds him and is responsible in damages for pain, suffering and disability resulting from aggravation of a preexisting disease or infirmity. Andrepont v. Ochsner, La.App., 84 So.2d 63; Radial v. Bankers & Shippers Insurance Company, La.App., 146 So.2d 426.
Counsel for appellant, American, maintains the lower court erred in awarding plaintiff judgment for medical expense inasmuch as the record is devoid of proof of expenses incurred. The contention is utterly without merit. The record discloses, (Page 3 of transcript of testimony), a stipulation was entered into at the very commencement of trial wherein medical expense incurred in treatment of plaintiff’s injuries following the accident was detailed, item by item, amounting to the sum of $3,287.79. The stipulation in question was entered in the record without objection and with the apparent consent of counsel for all litigants. Quite obviously the purpose of such a stipulation was to dispense with the otherwise time consuming necessity of producing testimony to establish each item of medical expense incurred by plaintiff. Under the circumstances, the stipulation was in the nature of an admission eliminating the requirement of proof of the subject matter thereof. Moreover, the record contains uncontradicted testimony of Dr. Ventre of proof of his charges in the sum of $1,415.00 for services rendered plaintiff as well as certain clinical expenses in the amount of $932.85. In view of the foregoing we conclude the trial court properly awarded judgment in plaintiff’s favor for medical expense in the sum of $3,200.00.
For the reasons hereinabove set forth the judgment of the trial court is amended in that it is annulled, reversed and set aside insofar as it casts defendants, Thomas Smith and Bituminous Casualty Corporation, in damages, in solido, with the remaining defendants herein and judgment rendered herein in favor of defendants, Thomas Smith and Bituminous Casualty Corporation, and against plaintiff, George Briley,' rejecting and dismissing said plaintiff’s demand against said defendants, at plaintiff’s cost. In all other respects the judgment of the trial court is affirmed.
Amended'and affirmed.