JANVIER, Judge.
Plaintiff, a pedestrian 42 years of age at the time of the occurrence, sustained serious injury to her right knee and left ankle when she fell while crossing Dauphine Street, in Nw Orleans, at the Canal Street corner, at about 5:20 o'clock in the late afternoon of November 7, 1963.
Alleging that the fall had been caused by the defective condition of the street and that the City of New Orleans had had actual or constructive knowledge of the defect and had failed to repair it and that the defect was such as to constitute a trap, which would not be noticed by the exercise of ordinary care, she brought this suit against the City of New Orleans and prayed for judgment in the sum of $106,-002.36.
The City of New Orleans denied that there had been a defect in the street and averred that if there had been such a defect it had not had previous actual or constructive notice of it and denied liability, averring also that plaintiff had been guilty of contributory negligence.
There was judgment in the District Court in favor of plaintiff in the sum of $14,-384.66, and the City has appealed.
There are three questions presented— first, was there a defect which was inherently dangerous; second, did the City have notice, either actual or constructive, which placed on it the duty of making the repairs before the occurrence of the accident, and third, was plaintiff herself at fault?
The fall occurred just before dark but after the lights on various automobiles and on the streets had been turned on, and it is shown that there were many pedestrians crossing at the same intersection. There was what is known as a “Winkie” signal light which, when green, gave pedestrians the right to cross the intersection and when red, required that they remain on the sidewalk and allow automobiles on Dauphine Street to enter Canal Street. Pedestrians were required to maintain a watch for the change in this “Winkie” light and to some extent to hurry to avoid a light change which might make it dangerous to cross. Furthermore, it is shown that that is an extremely busy comer and that numerous pedestrians were at that time crossing back and forth, and that this, to some extent, explains why the plaintiff did not notice the depression in the street which, according to the Chief Engineer of the Street Maintenance Department of the City, was apparently three and one-half feet wide by about six feet long and in the center was from three to four inches in depth.
The depression is also shown in certain photographs taken later, and while it is such as could probably have been noticed in complete daylight by a person not surrounded by other pedestrians and not watching for the possible change of the “Winkie” light, we think that, under the conditions then existing, it constituted a trap, and that plaintiff was not herself negligent in not noticing it, even though it may not have caused the fall of other pedestrians.
In Miller v. City of New Orleans, La. App., 152 So. 141, we said:
“* * * Pedestrians are not required to be constantly on the alert for possible dangers due to defective streets and need only see those dangers which are apparent and which would present themselves to the eye of a reasonably prudent person. * *”
Our conclusion is that the depression constituted a trap and that the City is liable unless it should appear that it did not have actual or constructive knowledge in time to make the necessary repairs.
*807 The question of where lies the burden of proof in such a situation is a very interesting one which we discussed at some length in Miller v. City of New Orleans, supra. This question was also discussed in St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273, and in Frisard v. Oalmann, La.App., 175 So.2d 407. It was held in the Frisard case that the facts and surrounding circumstances of each individual case control in determining whether, for the purposes of imposition of liability upon a municipality, a sidewalk defect is dangerous to such an extent as to constitute a trap. In determining whether there has been constructive notice, we must take into consideration the location of the defect with reference to the question of whether it is in a much used area of the City or in a location in some outlying area where a defect might not be noticed for a long time. In this case, the Chief Engineer to whom we have referred said that the defect was the result of a cut in the street by some other agency, possibly the Sewerage & Water Board, or New Orleans Public Service, and that after the cut had been made and the fill completed and repaved, something had caused the paving to subside and had left the defect. He said that this cut had been caused by the receding of the surfacing paving “after the hole was repaired. I don’t know how long, three months, six months or a year.” Article V of the Code of the City of New Orleans, in sections 61-79, provides that no person shall make any cut in any roadway in the City without first obtaining permission, and it is provided that when a permit is granted for the making of such cut, upon completion of the refilling and paving, the Director of Streets must be notified “so that the work may be inspected to determine whether or not it has been safely executed.”
Because of the tremendous pedestrian and automobile traffic at that point, it appears to us that constructive notice would come into play much sooner than in a case where a defect is in an outlying area, and, in view of this fact and in view of the fact that the duty of making inspection after such repairs is placed on the City, we think that the bui'den of proof was on the City rather than on the plaintiff, and that, accordingly, it is proper to hold that the City was under the duty of showing that the subsidence of the surface had occurred so shortly before the fall that it had not had time to learn of it and to repair it. It is not sufficient for the City to merely take the position that it had no knowledge of when the subsidence took place and that it might have been from a month to a year earlier.
This view is not in conflict with that expressed by our Brothers of the First Circuit in Bond v. City of Baton Rouge, La.App., 129 So.2d 887. There the Director of the City-Parish Department of Public Works stated that he had not previously examined the sidewalk in question. PIow-ever, the Court said that there was nothing in his testimony to indicate that the area involved had not been previously inspected. Here, we find an area, as already stated, in the most heavily traversed section of the City of New Orleans and find a duty of inspection imposed upon itself by the City.
It is contended on behalf of the City that Miss Eble was herself at fault since she stated that when she was crossing the street, she did not know whether she had looked down. She merely said: “I was looking ahead of me.” At such an intersection and at such a time and under such conditions, we do not think that there was any duty in the pedestrian to focus her eyes on the surface' of the street which she was traversing. On the contrary, she was required to notice the “Winkie” light and to notice the other pedestrians going in both directions, and she was justified in assuming that the paving at that most important intersection was in good condition. Nor did the fact that she was wearing contact lenses indicate that her sight was not sufficiently good to notice what was going on around her.
*808 The District Judge awarded $10,-000 for “pain, suffering, shock and mental anguish,” and $4,384.66 for hospital and medical expenses and loss of wages.
The plaintiff suffered serious injury to her right knee and her left ankle. She remained in the hospital from November 7, 1963 until January 14, 1964, a period of 68 days. From the medical evidence there could have been no serious contention that the amount was excessive except for the fact that, for a very long time before the accident and, in fact, after the accident and, so far as the record shows, until the present time, Miss Eble had been suffering from various physical disabilities, particularly from a condition called calcinosis cutis, and she had had several other falls before and after the accident. In addition to pointing to these facts, counsel for defendant contends that part of Miss Eble’s stay in the hospital was caused by a later fall which she sustained when, noticing another patient “having some kind of attack” and “gasping for breath”, she attempted to hold him up and her leg “split wide open again.”
We see no reason to allow a reduction in the amount awarded because of plaintiff’s previous condition, nor because of her attempt to assist the other patient in the hospital.
If plaintiff did have such a previous condition, it is obvious that the accident aggravated it. In Trascher v. Eagle Indemnity Co. of New York, 48 So.2d 695, this Court said:
“If, as a result of the accident, the old intervertebral disc injury in Mrs. Davis’s spine was aggravated, the defendant, under our law, is responsible in damages, for it has been said that a tort-feasor must take his victims as he finds them.
“In Poncet v. South New Orleans Light & Traction Co., 3 La.App. 64, we quoted what had been said by the Supreme Court in the leading case of Lapleiné v. Morgan’s L. & T. Railroad and Steamship Co., 40 La.Ann. 661, 4 So. 875, 877, 1 L.R.A. 378, part of which is: ‘* * * The duty of care and of abstaining from injuring another is due to the weak, the sick, the infirm, equally with the healthy and strong; and, when that duty is violated, the measure of damage is the injury inflicted, even though that injury might have been aggravated, or might not have happened at all, but for the peculiar physical condition of the person injured.’ ”
Our Brothers of the Third Circuit expressed this view in Rachal v. Bankers & Shippers Insurance Company, La.App., 146 So.2d 426:
“A tortfeasor must take his victim as he finds him. The tortfeasor is responsible for all the natural and responsible consequences of his wrong, even though the consequences of the tort are made much more serious or harmful by reason of a pre-existing physical defect or weakness of the injured person.”
In Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L.R.A.1918F, 862, our Supreme Court said:
* * * but it is well settled in the jurisprudence elsewhere that the fact that a person was already afflicted with a dormant disease that might some day produce physical disability is no reason why he should not be allowed damages or compensation for a personal injury that causes the disease to become active or virulent and superin-duces physical disability. * * * ”
This language the Supreme Court quoted with approval in Shaffer v. Southern Bell Telephone & Telegraph Co., 184 La. 158, 165 So. 651. See, also, Guerra v. W. J. Young Construction Company, La.App., 165 So.2d 882; Briley v. North River Insurance Company, La.App., 161 So.2d 449; *809 Cassreino v. Brown, La.App., 144 So.2d 608.
For the reasons assigned, the judgment appealed from is affirmed at the cost of defendant.
Affirmed.